CARSON et ux. v. TEXAS PIPE LINE CO.

No. 12737.

Court of Civil Appeals of Texas. Fort Worth.

Nov. 19, 1932.

Rehearing Denied March 4, 1933.

E. W. Napier, of Wichita Falls, for plaintiffs in error.

Weeks, Morrow & Francis, of Wichita Falls, and Seay, Seay, Malone & Lipscomb, of Dallas, for defendant in error.

CONNER, Chief Justice.

This suit was instituted by H. E. Carson and wife against the Texas Pipe Line Company for damages resulting from personal injuries sustained by Mrs. Carson by being struck and run down by a truck operated by one of defendant's servants on a public highway in Archer county on the 20th day of October, 1930.

At the time Mr. and Mrs. Carson were traveling in an easterly direction, as was also the truck in, question. Mrs. Carson was riding with her husband, father-in-law, and mother-in-law, the father-in-law driving. He stopped the car on the side of the road, as the testimony of plaintiffs tended to show, with the right wheels of the car on the shoulder next to the paved highway and with the left wheels several feet on the pavement. Mrs. Carson alighted from the car and was in the act of crossing the paved highway in an effort to reach her home, situated on the other side, when the defendant's truck ran her down, and she was injured in the particulars described in her petition.

The case was submitted to a jury on special issues, in answer to which the jury found that neither the brakes nor the horn on defendant's truck was in good working order; that the driver of the truck failed to sound the horn and failed to keep a lookout for persons and vehicles on the highway as he approached. The failures so found were further severally found to constitute negligence on the part of the defendant which proximately resulted in the injuries for which the plaintiffs sued; and their damages were assessed in the sum of $4,500.

The defendant requested the submission of some fifty special issues, of which ten were refused and forty given. Among those given as requested, we find the following:

No. 6. "Was the failure upon the part of Mrs. Carson to look in the direction from which Pasley's car was coming at the time she stepped from beyond the Carson car on the paved road negligence?" To which the jury answered "Yes," and further answered that such negligence was the contributing and concurring proximate cause of the accident.

Special issue No. 25 was as follows: "Do you find, from a preponderance of the evidence that the plaintiff, Mrs. H. E. Carson, on the occasion in question, permitted her attention to be distracted by responding to a call from some person in the parked automobile at a time when she knew, or by the exercise of ordinary care should have known, that she was exposed to the danger of being struck by other vehicles on said highway?" To which the jury answered "Yes," and further that such conduct was a contributing and concurring proximate cause of the accident.

Special issue No. 32 was as follows: "Do you find from a preponderance of the evidence that the plaintiff, Mrs. H. E. Carson, failed to keep that lookout for her own safety which a person of ordinary prudence would have kept under the same circumstances?" To which the jury answered "Yes," and further that such conduct was a contributing and concurring proximate cause of the accident.

In passing, we note that special issue No. 6 assumed that Mrs. Carson failed to look in the direction from which the truck was coming, whereas she testified without apparent contradiction that she in fact did look before stepping on the paved street and saw no car coming, and in substance that, when but a few feet on the paved street, she hesitated a moment in answer to a call from the car. However, we make no rulings upon the matters so far suggested, inasmuch as no assignments of error are presented which attack the form, manner, or number of special issues submitted to the jury; the only assignment of error presented for our consideration being one which complains of the action of the court in overruling the plaintiffs' motion for new trial, based on the misconduct of the jury. In support of this ground for a new trial, the plaintiff presented 9 of the 11 jurors who tried the case; it being agreed that the two not presented would testify substantially as did the 9. As showing the general trend and effect of the testimony, we quote therefrom as follows:

"Q. Mr. Tabor, after the jury had determined issues 1 to 12 in the court's main charge, those issues relating to the neglect of the defendant, and the defendant's driver and the one that relates to the amount; after you had determined those did you not begin discussing the issues relating to the neglect, or the negligence of Mrs. Carson, and Mrs. Carson's father, tell the jury whether there were statements made to the jury, or by the jury in the jury room that those issues were not material and would not affect the verdict either way? A. Yes, sir.

"Q. Did you believe that? A. Yes, I did.

"Q. If you had not believed that statement was true would you have answered those issues as you did against the plaintiff? A. No, sir; I would not."

Juror Wingo testified as follows:

"Q. When it was talked in the jury room that it was immaterial about those issues, you believed that? A. Yes, sir.

"Q. And then it was discussed that since you had put in so much time already that you would just hurry through and answer those just in a way to get through with them? A. Yes, sir.

"Q. And you did that and believed that they were immaterial? A. Yes, sir.

"Q. If you had known that they were material, or would affect your verdict in any manner, would you have answered them against the plaintiff, as you did? A. Well, really I did not know that it was against her at the time.

"Q. You did not think that it was? A. No, sir.

"Q. But if you had known it, you would not have answered them against the plaintiff, is that your testimony? A. Yes, that is my testimony.

"Q. Now, when you got down to these issues of the defendant's here, affecting the conduct of Mrs. Carson, you did not think that they were material, and you just answered those any way to get through? A. Yes, sir. We were tired of waiting and taking up so much time and some of them said it was just immaterial about that—said that it would not make any difference and so we agreed and just went ahead and hurried, to kind of get through.

"Q. And you did not consider the evidence then, in answering those issues? A. No sir, we did not think that they would amount to so very much."

The juror Talley testified as follows:

"Q. After you heard that discussion, did you assume that that was true, that it did not make any difference how you answered those issues? A. I believed that it was true.

"Q. Did you answer those issues according to the evidence or did you answer them just to get through—thinking that they would not be material any way? A. I thought that the case was decided when we answered those others.

"Q. You did not consider the evidence in answering those issues? A. No, sir.

"Q. Did you answer them just so that you could get through? A. Get through, that was about the last ones I think we answered."

The juror Powers testified as follows:

"Q. One or more jurors stated in the jury room, during the deliberations there, that it did not make any difference about those issues? A. That we had answered the main charges and found $4,500.00.

"Q. Now, when you heard that discussion, did you believe that it would not make any difference how you answered those issues? A. Yes, I did not think that it would make any difference how we answered those issues.

"Q. And you went ahead then and answered the issues without regard to the evidence, and just to get through, is that right? A. Yes sir, to get through with it. We did not think that it would make any difference and we just did not regard the evidence much, and just answered them and signed it up.

"Q. You did not think that it would make any difference and you did not regard the evidence? You just answered them and signed it up in order to get through? A. Yes sir."

The juror Johnson testified as follows:

"Q. Then it was your idea that Mrs. Carson nor her father-in-law were not at fault? A. It was our idea—

"Q. Yes, is that your idea that they were not at fault, and that the fault lay with the defendant? A. Yes, that is right in this way; I felt that she was guilty of negligence because she was there, more so than I was.

"Q. Because she happened to be there on the road? A. That is the way I figured she was contributing because she was there and I was not.

"Q. And then the same thing would apply in all cases, if a person crosses the road, the fact that they were crossing the road or not in a proper manner, whether in a proper manner or not, according to the idea you had in the jury room that would be the contributing cause, that was the idea was it, the fact that she crossed the road? A. Yes, if she was not there he could not have hit her.

"Q. If she was not there he could not have hit her? A. Yes, sir.

"Q. It was your idea, in awarding her damages that she said were due her? A. Yes.

"Q. You felt that she was entitled to it? A. Yes.

"Q. That would compensate her for her injuries because you felt the defendant was at fault? A. Yes, sir.

"Q. That was your idea? A. Yes, sir.

"Q. And if you had known that the statement with reference to immateriality of the issues affecting her negligence were not correct would you have answered it as you did, would you have found her guilty of contributory negligence if you had known that would have affected her recovery? A. No, sir, I would not.

"Q. Then those statements did influence you to some extent? A. Yes, I would say they did on some questions.

"Q. And on some of the questions you mean by that those that contradict your putting the responsibility on her? A. Yes.

"Q. Because you did not feel like the responsibility was on her? A. No, I did not.

"Q. And you felt like it was upon the defendant or its employee? A. Yes, sir."

Defendant seeks to avoid the force of the testimony such as we have quoted by testimony developed on a vigorous cross-examination of the jurors. It would unduly extend this opinion to quote all that seems to be relied upon. It has been examined, however, and in our judgment it fails to relieve the probability of error and prejudice to the cause of plaintiff, resulting from the conduct and attitude of the jury in the consideration of the case. However, as illustrating the force of the testimony on cross-examination developed by appellee, we venture to quote the following from the cross-examination:

"Q. Mr. Milford, as I understand you, it was your desire to find in favor of the plaintiff, Mrs. Carson, is that correct? A. Yes, sir.

"Q. And that when you answered the questions in the court's main charge, and gave $4500, you figured that you had found for her? A. Yes sir.

"Q. Now then, you heard me argue the case, did you not—you remember me arguing the case? A. Yes sir.

"Q. You remember me taking up each of these issues, a great many of these special issues and reading them to you and discussing them at length? A. Yes sir.

"Q. Now, when you came around to consid-'er these special issues, and by special issues I mean those that were not in the court's main charge, you say that you figured that you had already found for the plaintiff, and that it would really be immaterial how you answered those issues? A. Yes sir.

"Q. But in answering them, some of them you answered, some of them favorable to the plaintiff and some favorable to the defendant —now, you tried to answer them the best that you could from the evidence, didn't you? A. Well, guess that we did. * * *

"Q. In other words, you knew what answers you were making. All the jurors knew what answers they were making? A. Yes sir."

On cross-examination of juror A. C. Harris, he was asked how the jury went about making their verdict, and he answered:

"To tell you the truth, there was so much arguing going on, that I do not know just how it all did come about.

"Q. You figured however it was about 80% Mr. Pasley's (the driver of the car) fault, and 20% hers. A. That is the way that we figured it; some were 70—some were as low as 60; we taken another vote and we decided it would be about 80 and 20.

"Q. About 80% Pasley's fault and about 20% her fault? A. Yes sir.

"Q. And then some said 60% his and 40% hers? A. Yes; and some said 70 and 30. I think that there was one that had it 90 and 10, something like that.

"Q. And then you discussed it and took another vote? A. We discussed it and took another vote and all voted 80 and 20.

"Q. And that is the way that it finally stood? A. Yes sir.

"Q. How long were you engaged in answering those special issues, that you were asked? A. Well, will say that we were about two-thirds of a day.

"Q. You answered the court's main charge then pretty quick? A. Yes sir. * * *

"Q. At any rate, each one of these special issues of the defendant, you read them over did you not, Mr. Harris? A. I suppose they were read over one thousand times in there, most every one of them.

"Q. And of course now in determining whether it was an avoidable accident or unavoidable accident, or whether that car was parked on the highway or off the highway, you did not have any way to answer that except by what testimony told you, did you? A. No sir.

"Q. In other words, you did not just shut your eyes and answer the question? A. No sir, we tried not to.

"Q. You stated awhile ago, in answer to Judge Napier, that you figured that it was immaterial in a way—what did you mean by 'in a way'? A. Well, in a way, that we just figured the first twelve for the evidence and we did not know anything about the last ones, so that we would just go ahead and answer them."

From the testimony of juror Tabor on cross-examination we quote the following:

"* * * Q. You read them (requested issues) over, did not you? A. Yes.

"Q. And discussed them after they were read over? A. Yes.

"Q. And then you discussed the evidence as applied to them, didn't you? A. Yes, we read them over.

"Q. You made the best answers you could from the evidence before you, isn't that correct? A. Some of them we did not understand, and we did not think it made any difference.

"Q. Which ones was it you did not understand? A. Two or three of them.

"Q. At any rate in trying to answer them you did not just pitch heads and tails and say we will answer this one yes, and this one no —you did not just shut your eyes and answer them like that—you considered the evidence the best you could, you tried to answer them for the benefit of the Judge? A. Yes, the best we could, I guess.

"Q. You did not have anything to answer

332

them from except the evidence, did you? A. We did not understand some of them. * * *

"Q. Now, who was it that made the statement that it would not make any difference anyway? A. I don't know; possibly all of us; I heard it two or three times.

"Q. Did you make that statement? A. I don't know, I might have. * * *

"Q. You just got to discussing it and you concluded that it would not make any 'difference? A. Would not make any difference, did not think?

"Q. Sir? A. Would not make any difference."

Defendant also offered the following from the testimony of juror Johnson on cross-examination:

"Q. Do you mean to tell the court that you would have answered these questions differently from the way you did answer them if you thought it was necessary to find for the lady? A. Yes, I would have.

"Q. Notwithstanding the evidence showed that you would have answered differently in order to have found for her? A. Yes.

"Q. But in answering them you did not realize the effect it would have upon her? A. No.

"Q. You did undertake to give the answers in that two hours time the best you could under the evidence? A. Yes."

As heretofore stated, we do not think the evidence on cross-examination relieves the probability of error prejudicial to appellants, as shown by the testimony of the jurors on examination in chief.

■ In the case of Moore v. Ivey, 277 S. W. 106, by Section A of our Commission of Appeals, in an opinion especially approved by our Supreme Court, it was held that if, upon a consideration of the whole of the pertinent record, it is reasonably doubtful whether improper conduct of the jury affected the amount of the verdict or decision of any other material issue, the verdict should be set aside by the trial judge; and, if a new trial is not granted, there is an abuse of discretion by the trial judge, and a reversal becomes the duty of the appellate court; and further, when misconduct of the jury is once shown, and there is a reasonable doubt as to its effect, that doubt must be resolved against the verdict. The verdict must be set aside if, upon a material issue, a juror be influenced at all by misconduct, and the extent is immaterial.

■ It must certainly be held, we think, that the misconduct of the jury as shown by the substantially uniform testimony of its members constitutes misconduct as defined by our cases. There is no contention that the evidence shows without dispute that Mrs. Carson was guilty of contributory negligence in any of the particulars alleged or shown in the verdict of the jury, or even that the evidence

is sufficient to support the findings in such particulars, yet the findings are used to defeat the right of a recovery which the unquestioned findings in her favor entitled her. Hence it is all-important to her that the defensive issues of contributory negligence be carefully considered and determined in her favor unless established to the contrary by a preponderance of the evidence, uninfluenced by impatience, hurry, or supposed want of materiality or injury to rights to which the jury believed she was entitled.

The case of Mann v. Cook (Tex. Civ. App.) 11 S.W.(2d) 572, is one similar to this, in which the subject of misconduct of the jury was considered carefully in an opinion by Mr. Justice Dunklin. In that opinion numerous authorities relating to the subject are cited and discussed and it was held, quoting from the headnotes, that: "In action for injuries in automobile collision, misconduct of jury in not thoroughly considering issue of contributory negligence, because of belief in statement, made in jury room, that finding of such negligence would not preclude recovery, held to require reversal of judgment for defendants, and new trial, under Rev. St. 1925, arts. 2232 and 2234, notwithstanding implied finding that such misconduct did not operate to prejudice of plaintiffs." See, also, the cases of Southern Traction Co. v. Wilson (Tex. Com. App.) 254 S. W. 1104, 1105; Taylor v. Alexander (Tex. Civ. App.) 34 S.W.(2d) 903.

We conclude that the court erred in refusing to grant appellant's motion for rehearing, and that the judgment should be reversed and the cause remanded.

■■ On another trial we suggest that, as now presented, the evidence shows that the father-in-law of Mrs. Carson was driving the automobile from which she departed, and defendant's special issue No. 3 authorized a finding on contributory negligence on the part of Mrs. Carson if the "Carsons" parked their automobile on the paved or improved portion of the highway. This was erroneous in the absence of testimony showing that the negligence, if any, of the father-in-law in so doing was imputable to Mrs. Carson. Also, as before stated, the requested special issue No. 6 assumes that Mrs. Carson failed to look in the direction of the approaching truck, whereas she testified that she in fact did look after alighting from the car, though perhaps she did not so look after having stepped on the highway and answered to a call from the occupants of her car. We think the question was for the jury without an assumption, and that the errors indicated in these special charges at least should be corrected on another trial.

■ We wish to further say that it seems inferable that there cannot be as many as fifty or even forty ultimate issues of fact in a simple case of a collision on a highway. A request for that number takes unnecessary

time and increases the probability of confusion of mind and mistake on the part of the judge in the hurry of the trial, and of hurry, impatience, and want of careful consideration on the part of the jury, thus causing a departure from a straight line to a just conclusion and a consequent necessity for another trial. We wish to discourage such practice, which all too frequently appears, and to that end all costs in this case since the institution of the suit, both in this court and in the court below, are taxed against appellee.