Juanita Brittian REESE et al., Appellants,

v.

Lewis Vincent BRITTIAN, Jr., et al., Appellees.

No. 8897.

Court of Civil Appeals of Texas, Amarillo.

Aug. 28, 1978.

Rehearing Denied Sept. 25, 1978.

LaFont, Tunnell, Formby, LaFont & Hamilton, Larry W. McEachern, Plainview, for appellants.

W. Frank Gaston, Day, Owen, Lyle & Voss, Plainview, for appellees.

DODSON, Justice.

In this will contest, contestants Juanita Brittian Reese and Daurice Kathleen Brittian Francis appeal from a judgment admitting to probate the purported last will and

testament of Lewis V. Brittian, Sr.,[1] dated 11 May 1976. Contestants challenged the purported will, offered for probate by proponents-appellees Lewis Vincent Brittian, Jr., Cleora Brittian and David LeRoy Brittian, on grounds that the deceased was unduly influenced and lacked testamentary capacity to make and execute the will. The jury found against contestants on these issues.

Contestants now maintain that the trial court erred in refusing to grant a new trial because the jury committed misconduct resulting in harm to contestants. Proponents contend, however, that the judgment should be affirmed because the alleged jury misconduct amounts to no more than the jury misconstruing the court's charge, and that in any event, the evidence is neither legally nor factually sufficient to support a finding favorable to the contestants on the undue influence issue. We reverse the judgment and remand the cause for a new trial.

Mr. Brittian's only marriage was to Myrtle Brittian, who preceded him in death. Vincent, Juanita and Kathleen are the Brittian's children. Cleora Brittian is the wife of Vincent and David LeRoy Brittian is a nephew of Mr. Brittian.

Mr. and Mrs. Brittian owned, as community property, three separate farms located in Hale County, Texas. Prior to April 1972, the Brittians gave Vincent an undivided interest in tracts comprising 650 acres and Juanita received an undivided interest in a 315 acre tract.

On 8 April 1972, Mr. and Mrs. Brittian made and executed separate wills containing identical provisions. After Mrs. Brittian's death in 1972, her last will and testament was admitted to probate. Under this will Mr. Brittian received an undivided one-third of Mrs. Brittian's interest in the three farm properties,[2] Vincent received an undivided two-thirds of her interest in the tracts comprising 650 acres, and Juanita

and Kathleen received an undivided two-thirds of her interest in the 315 acre tract and the 425 acre tracts, respectively. The rest of Mrs. Brittian's property was devised to the three children equally. Mr. Brittian's 1972 will was to the same effect.

On 11 May 1976, Mr. Brittian made and executed the will offered for probate in this cause. In this will he disinherited his two daughters, Juanita and Kathleen, and directed that Vincent receive his interest in the 650 acre tracts, Cleora Brittian receive his interest in the 315 acre tract[3] and David LeRoy Brittian receive his interest in the 425 acre tracts. The rest of Mr. Brittian's estate was devised to his son Vincent.

We consider first the legal and factual sufficiency of the evidence to raise the issue of undue influence. Certain basic principles merit consideration in this regard. First, the contestants must prove by a preponderance of the evidence "the existence and assertion of an influence" which operates "to subvert or overpower the mind of the testator at the time of the execution of the testament . . . which the maker thereof would not have executed but for such influence." *Estate of Woods*, 542 S.W.2d 845, 846–47 (Tex.1976). Secondly, undue influence is a question of fact, and from its very nature the proof usually must be by circumstantial rather than direct evidence. *Hassell v. Pruner*, 286 S.W.2d 266, 268–69 (Tex.Civ.App.—Amarillo 1956, writ ref'd n. r. e.).

Circumstantial considerations bearing upon the issue of undue influence include the condition of the testator's mind, his age, weakness, infirmities and his surroundings; the selection of and directions to the attorney who drafted the will; the circumstances attending the execution of the will; the opportunity of a proponent to unduly influence the testator; the consist-

---

1. Lewis V. Brittian, Sr., the deceased, will be referred to in this opinion as Mr. Brittian.

2. Mr. Brittian also received three separate lots in the Hillcrest Addition of Plainview, Hale County, Texas.

3. Cleora was also devised three separate lots in the Hillcrest Addition of Plainview, Hale County, Texas.

ent association of a proponent with a testator and attending to his business for him; and the unnaturalness of the dispositions made in the will which, by its terms, makes a difference between those who, according to the natural law, ought to stand as objects of the testator's bounty; and any other pertinent factors having probative force that show the exertion of undue influence. *Long v. Long,* 133 Tex. 96, 125 S.W.2d 1034, 1036–38 (1939); *Rothermel v. Duncan,* 369 S.W.2d 917, 922–24 (Tex.1963); *Hassell v. Pruner, supra.*

In the case at bar, Mr. Brittian was 82 years of age when he executed the will of 11 May 1976, which was admitted to probate. As early as 1972 he was treated for dizzy spells, periods of confusion and possible light strokes. In 1976 his health began to deteriorate, beginning with a severe stroke in February followed by a more severe stroke in April. The April stroke resulted in one of his legs becoming paralyzed, thus causing Mr. Brittian to be more or less confined to Vincent's home.

Following his illness, Mr. Brittian hired a male helper to take care of him and to be his "legs." With the approval of Mr. Brittian, Vincent obtained the services of the helper. The helper was later instructed not to leave Mr. Brittian alone with the two daughters.

In the latter part of April 1976, Vincent, with the support and encouragement of the nephew, David LeRoy, began to take control of his father's business affairs under a power of attorney executed by Mr. Brittian. Vincent attempted to sell grain held in storage at United Farm Industries in Plainview, Hale County, Texas, and to have the proceeds delivered to him as his father's agent. However, a part of the grain was jointly owned by Mr. Brittian and Juanita. Mr. Brittian had also previously notified the grain elevator company to place Juanita's name on the account carried with the company. Thus, the grain company, on advice of its legal counsel, filed an interpleader action in the district court of Hale County, Texas, concerning the grain and joined all of the parties' interest in the action, including Mr. Brittian and Juanita. Mr. Brittian was led to believe and became convinced from this matter that the two daughters were trying to take his property.

The evidence further shows that ill will existed between Vincent and David LeRoy on one side and Juanita and Kathleen on the other, evidenced by an altercation which occurred approximately three days before the 11 May 1976 will was executed. On this occasion the two daughters, accompanied by Kathleen's son, went to the farm partially owned by Juanita to obtain some vegetables from a garden and to retrieve a sideboard owned by Kathleen. By prior instructions, their presence was reported by a member of the farm tenant's family. Soon thereafter David LeRoy arrived at the farm. The uncontroverted evidence shows an exchange of words and an attempt by David LeRoy to strike Juanita ensued. In the exchange of words, David LeRoy ordered the two daughters and the son off the premises, saying they had no business to be out there.

Later this same day, Kathleen, accompanied by her son, reported this matter to Mr. Brittian. He responded by indicating "We'll just send them home" (referring to David LeRoy and his wife). However, when confronted with the situation in the presence of Vincent and David LeRoy, Mr. Brittian simply hung his head and remained silent. Vincent, in the presence of Mr. Brittian, told Kathleen that "Juanita would be cut out of the will if she didn't sign the power of attorney" to him "[a]nd you will be, too, . . . if you don't sign." Vincent further told Kathleen, "If you don't sign it, it will be a black, black day for you." Kathleen was also told that Juanita "couldn't talk, see, write, visit or even come to the funeral of" Mr. Brittian.

On 10 May 1976, Vincent and David LeRoy went to Lubbock to see the attorney who had originally prepared the 1972 wills for Mr. and Mrs. Brittian. They desired an interpretation of a particular paragraph in Mrs. Brittian's will concerning the right of Mr. Brittian to control the jointly owned farm properties, and apparently sought ad-

vice concerning Vincent's authority in connection with these properties under the power of attorney given him by Mr. Brittian.

Vincent and David LeRoy returned to the lawyer's office early on the morning of 11 May 1976, where they talked to a partner in the law firm who had not prepared the 1972 will. They instructed this attorney to prepare a will for Mr. Brittian. The attorney then drafted the will according to the terms given to him by Vincent and David LeRoy. Later that day, the attorney took the will to Mr. Brittian for execution. Vincent obtained three witnesses, all tenant farmers on the property of Mr. Brittian. The will was executed in the home of Vincent in the presence of the three witnesses, the attorney and his secretary. Vincent, David LeRoy, Cleora Brittian and the male helper were also present.

On the same day, Kathleen attempted to speak to her father by phone at Vincent's residence on three different occasions. Each time she called she was informed that Mr. Brittian was unavailable to come to the phone.

On the other hand, the proponents presented evidence that Mr. Brittian was of sound mind, knew the nature and extent of his property, knew the persons who were the natural objects of his bounty, that he intended to disinherit his two daughters, that he was a very astute businessman and of strong will, and that no one could influence him to do anything he did not desire to do.

We have not attempted to detail all of the evidence, both favorable and unfavorable, to support the various positions of the parties. However, the evidence detailed, together with the other evidence introduced at the trial and reviewed to us, leads to the conclusion that such evidence was sufficient to raise the issue of undue influence and that the issue was properly submitted to the jury.

■ We next consider the issue concerning alleged jury misconduct. Whether or not jury misconduct occurs is a question of fact, but whether or not injury probably resulted therefrom is a question of law to be determined by the appellate court. *City of Houston v. Quinones*, 142 Tex. 282, 290, 177 S.W.2d 259, 263 (1944).

Five jurors testified at a hearing on the contestants' motion for a new trial. All of the jurors testified to certain overt acts committed by some of the jurors during the jury's deliberation. From the evidence presented and on request of the contestants, the trial court found, in summary, that:

(1) Many statements were made by at least two jurors that the law required direct evidence of a conversation that proponents tried to convince Mr. Brittian to change his will before the jury could write a verdict of undue influence.

(2) Statements were made by at least three jurors that, under the law, the burden of proof in this kind of case had to be beyond a reasonable doubt.

(3) Statements were made by at least two jurors that any doubt in the case was to be resolved in favor of upholding the will.

We do not agree with the proponents' contention that the jury simply misconstrued the court's charge in this case. Our review of the charge does not reveal any language from which the jury could reasonably have inferred that the burden of proof in the case was beyond a reasonable doubt, or that any doubt in the case was to be resolved in favor of upholding the will, or that the law requires direct evidence of a conversation wherein the proponents tried to convince Mr. Brittian to change his will. The court's charge correctly stated the burden of proof to be by "a preponderance of the evidence" and properly defined that term. The trial court also charged on circumstantial evidence. After reviewing the entire record in the case, we conclude that the jury simply ignored the court's charge on the law applicable to the case and substituted the self-styled pronouncements on the law made by some of the jurors.

In determining whether or not overt acts of jury misconduct probably caused harm to the contestants, we may consider such matters as the nature of the conduct; the significance of the conduct; the presence or absence of a rebuff; whether or not misconduct statements were asserted as fact or opinion; the time the misconduct occurred; whether there was a change in the vote after the misconduct; the duration of the deliberations; and any other matters occurring during the trial that might have a bearing on the subject. Pope, *The Mental Operations of Jurors*, 40 Texas L.Rev. 849, 865–66 (1962).

The evidence at the hearing on contestants' motion for new trial further shows that the jury's first vote on the undue influence issue was either split about even as several jurors testified, or as one juror testified, nine for undue influence and three against. After this vote the jury continued to deliberate for approximately four hours. Throughout these deliberations, at least one juror was adamant that there must be direct evidence of a conversation by the proponents attempting to convince Mr. Brittian to change his will. Three jurors consistently stated that the burden of proof was beyond a reasonable doubt. At least two of the jurors likewise consistently maintained that any doubt in the case had to be resolved in favor of upholding the will. There is no evidence that during the deliberations any juror rebuffed these incorrect statements of the law. After these statements were made by some of the jurors, at least four or more of the jurors changed their votes from undue influence to no undue influence. The jury's verdict was signed by only ten jurors.

We have reviewed and considered all of the record in this case, including both the evidence at the hearing on motion for new trial and the evidence on the trial of the merits, and from such evidence we conclude that the overt acts of jury misconduct were material and probably did cause harm to the contestants. Thus, we sustain contestants' points of error one through four. This determination requires us to reverse the judgment of the trial court and remand the cause for a new trial.

Because of our remand, we shall address two other matters presented by the contestants which could reoccur in further proceedings in this case. The contestants offered evidence of four friendly law suits in 1965 wherein Mr. and Mrs. Brittian desired to extinguish written trusts made by them in that same year. In these trusts the Brittians granted to each of their three children and to one grandchild an undivided interest in three farm properties owned by them. The purpose of the lawsuit was to place full legal title of these undivided interests in the four beneficiaries of the trust to enable the beneficiaries to exchange deeds and "wind up with one particular tract of the land" rather than an undivided interest in all three tracts of land.

The contestants also offered evidence of an unexecuted will prepared for Mr. Brittian under date of 23 March 1972. This purported will contained provisions granting each child an undivided interest in a particular tract of farm land. The particular tract that each child was to receive an undivided interest in was the same tract that each had previously received an interest in under the trust.

This evidence was offered, in each instance, to demonstrate the testator's state of mind in regard to extensive estate planning, how he desired his estate to be divided among his children, and the particular properties he desired to devise to each specific child. The proponents objected to the admission of this evidence in each instance on the grounds that the same was too remote in time from the 11 May 1976 will.

In a will contest case the testator's state of mind is material to the ultimate issues to be determined, *i. e.*, testamentary capacity and undue influence. Whether or not the evidence is offered is too remote to be material to this determination, generally, will be determined on a case by case basis. *Singleton v. Carmichael*, 305 S.W.2d 379, 384 (Tex.Civ.App.—Houston 1957, writ ref'd n. r. e.). However, the proffered evidence here, in each instance,

forms a link in the chain of circumstances intending to show a design of Mr. Brittian to provide for all of his children and a desire to devise each child a particular tract of his farm land. Under the circumstances, we conclude that the remoteness in time goes to the weight to be given the testimony rather than its admissibility. *See Scott v. Townsend*, 106 Tex. 322, 166 S.W. 1138 (1914); *Brown v. Mitchell*, 88 Tex. 350, 31 S.W. 621 (1895); *Anderson v. Clingingsmith*, 369 S.W.2d 634 (Tex.Civ.App.—Fort Worth 1963, writ ref'd n. r. e.). The excluded evidence should have been admitted over the remoteness objection.

In summary, we sustain contestants' points one through four. The judgment of the trial court is reversed and the cause is remanded for a new trial.