

IN THE
TENDTH COURT OF APPEALS

No. 10-08-00128-CV

DEBBIE HUNTER, INDIVIDUALLY
AND AS REPRESENTATIVE OF THE
ESTATE OF ROBERT HUNTER,
ERIC HUNTER, STEPHANIE BERAULT,
AND WANA HUNTER,

                                                    Appellants

v.

FORD MOTOR COMPANY, INC.,

                                                    Appellee

From the 170th District Court
McLennan County, Texas
Trial Court No. 2001-179-4

# O P I N I O N

In this products-liability action, Appellants Debbie Hunter et al. (the Hunters) appeal a take-nothing judgment, raising three issues. We will affirm.

**Background**

Bob Hunter was killed in a post-collision fire that occurred after the 1999 Ford F-350 diesel pickup truck he was driving collided nearly head-on with a Toyota pickup

truck. The Toyota's driver was killed instantly. Bob's truck ended up on its side, and a couple stopped at the scene immediately after the collision. Bob was alive and conscious (later determined to have suffered only three broken ribs), but his legs were trapped and he was unable to get out. A small fire started, but the motorists and other bystanders were unable to put it out with several small fire extinguishers. The fire quickly spread to the cab area, and by the time a fire truck could arrive, the truck was completely aflame and it was too late to rescue Bob, who burned to death.

The Hunters sued Ford on the theory that the fire was started by a design defect in the cable connecting the truck's dual-battery system. Ford's theory was that the source of the fire was flammable transmission fluid spewing from the ruptured transmission housing onto the hot surfaces of nearby engine components. After about nine days of testimony and the introduction of several hundred exhibits, but only after deliberating about forty minutes, the jury unanimously found that there was no design defect.

## Sufficiency of the Evidence

We begin with the Hunters' second and third issues, which seek reversal and remand for a new trial on the grounds that they established a design defect as a matter of law and that the jury's no-defect finding is against the great weight and preponderance of the evidence.

### Standards of Review

When the party that had the burden of proof at trial complains on appeal of the legal insufficiency of an adverse finding, that party must demonstrate that the evidence

establishes conclusively, *i.e.*, as a matter of law, all vital facts in support of the finding sought. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). In reviewing the jury's verdict for the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the prevailing party, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 808 (Tex. 2005). Thus, we must credit favorable evidence for Ford if reasonable jurors could, and disregard evidence contrary to the jury's finding that there was no design defect unless reasonable jurors could not. Moreover, we must not substitute our opinion on witness credibility for that of the jury. *Id.* at 816-17.

> Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another. Reviewing courts cannot impose their own opinions to the contrary.
>
> Most credibility questions are implicit rather than explicit in a jury's verdict. Thus, reviewing courts must assume jurors decided all of them in favor of the verdict if reasonable human beings could do so. Courts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it.
> …
> Nor is it necessary to have testimony from both parties before jurors may disbelieve either. Jurors may disregard even uncontradicted and unimpeached testimony from disinterested witnesses. … Even uncontroverted expert testimony does not bind jurors unless the subject matter is one for experts alone.
>
> Of course, "[t]he jury's decisions regarding credibility must be reasonable." Jurors cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted. And as noted above, they are not free to believe testimony that is conclusively negated

by undisputed facts. But whenever reasonable jurors could decide what testimony to discard, a reviewing court must assume they did so in favor of their verdict, and disregard it in the course of legal sufficiency review.

*Id.* at 819-20 (footnotes and citations omitted).

When a party who had the burden of proof complains of the factual insufficiency of an adverse finding, it must demonstrate that the adverse finding is contrary to the great weight and preponderance of the evidence. *Dow Chemical,* 46 S.W.3d at 242; *Cropper v. Caterpillar Tractor Co.,* 754 S.W.2d 646, 651-53 (Tex. 1988). We weigh all the evidence and set aside the adverse finding only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chemical,* 46 S.W.3d at 242.

In doing so, we must detail the evidence and state in what regard the contrary evidence greatly outweighs the evidence in support of the adverse finding. *Id.* We must also remember that it is within the province of the jury to determine the credibility of the witnesses and the weight to be given their testimony. *Brush v. Reata Oil & Gas Corp.,* 984 S.W.2d 720, 725-26 (Tex. App.—Waco 1998, pet. denied). The trier of fact may believe one witness and disbelieve another. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex. 1986). It may resolve inconsistencies in the testimony of a witness, and it may accept lay testimony over that of experts. *Id.* We may not pass upon a witness's credibility or substitute our judgment for that of the jury, even if the evidence might clearly support a different result. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex. 1998) (citing *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634 (Tex. 1986)).

*O'Connor v. Wilson,* 127 S.W.3d 249, 254 (Tex. App.—Waco 2003, pet. denied).

### Design Defect

When a claimant alleges a design defect, the burden is on the claimant to prove by a preponderance of the evidence that (1) there was a safer alternative design and (2) the defect was a producing cause of the personal injury, property damage, or death for which the claimant seeks recovery. TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(a) (Vernon 2005); *Davis v. Conveyor-Matic, Inc.,* 139 S.W.3d 423, 429 (Tex. App.—Fort Worth 2004, no pet.). A claimant must not only meet the proof requirements of the statute but must show, under the common law, that the product was defectively designed so as to be unreasonably dangerous, taking into consideration the utility of the product and the risks involved in its use.

*Hernandez v. Tokai Corp.,* 2 S.W.3d 251, 257 (Tex. 1999); *Honda of Am. Mfg., Inc. v. Norman,* 104 S.W.3d 600, 604 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

*General Motors Corp. v. Burry,* 203 S.W.3d 514, 529 (Tex. App.—Fort Worth 2006, pet. denied).

> "[S]afer alternative design" means a product design other than the one actually used that in reasonable probability:
> (1) would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death without substantially impairing the product's utility; and
> (2) was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.

TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(b).

*Expert Testimony and Conclusive Evidence*

On their design-defect claim, the Hunters had the burden of proof. The parties do not dispute, and we agree, that the Hunters were required to prove their design-defect claim with expert testimony. *See, e.g., Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 583 (Tex. 2006) (expert testimony needed to establish causation in products-liability case where plaintiff alleged defect in truck's fuel and battery systems caused fire).

The gist of the Hunters' argument is twofold. First, they contend that Ford's expert testimony in this case on its theory of the fire's causation is unreliable and thus incompetent evidence that cannot support the jury's no-defect finding and the judgment. *See General Motors Corp. v. Iracheta,* 161 S.W.3d 462, 470-71 (Tex. 2005) (stating that conclusory, speculative, or incompetent evidence cannot support a judgment). This contention is misplaced because that rule of law necessarily applies

only to a jury finding and judgment in favor of the party who had the burden of proof. *See id.; Liberty Mut. Ins. Co. v. Burk,* --- S.W.3d ---, ---, 2009 WL 2751039, at *4 (Tex. App.—Fort Worth Aug. 31, 2009, no pet. h.). In this case, Ford did not have the burden of proof; it was not required to prove there was no defect. *See Burk,* --- S.W.3d at ---, 2009 WL 2751039, at *4. Ford also was not required to prove an alternate theory for the fire, and, not having the burden of proof, it need not have presented any expert testimony at all. *See id.* Accordingly, the alleged unreliability of Ford's expert testimony, which we note the Hunters did not move to exclude or object to at trial, is immaterial, for holding otherwise would improperly shift the burden of proof to Ford. *See id.*

Having argued that Ford's expert testimony was unreliable and should be disregarded on appeal, the Hunters next contend that they established their design-defect claim as a matter of law through their own now-uncontroverted expert testimony, which they assert was binding on the jury. Even if we were to disregard Ford's expert testimony and to review only the Hunters' expert testimony, in this case the jury could still properly determine that the Hunters had not proved a defective design that was unreasonably dangerous. *See Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 338-39 (Tex. 1998); *Rentech Steel, L.L.C. v. Teel,* --- S.W.3d ---, ---, 2009 WL 2466890, at *2-3 (Tex. App.—Eastland Aug. 13, 2009, no pet. h.); *American Interstate Ins. Co. v. Hinson,* 172 S.W.3d 108, 118 & n.3 (Tex. App.—Beaumont 2005, pet. denied).

Uncontroverted expert testimony may be regarded as conclusive if the nature of the subject matter requires the factfinder to be guided *solely* by the opinion of experts

and the evidence is otherwise credible and free from contradictions and inconsistency. *Uniroyal,* 977 S.W.2d at 338. An expert's testimony may be contradicted by the testimony of other witnesses or by cross-examination of the expert witness. *Gober v. Wright,* 838 S.W.2d 794, 797 (Tex. App.—Houston [1st Dist.] 1992, writ denied), *abrogated on other grounds, State Farm Fire & Cas. Co. v. Morua,* 979 S.W.2d 616 (Tex. 1998).

> There are several types of conclusive evidence. First, an appellate court conducting a legal sufficiency review cannot "disregard undisputed evidence that allows of only one logical inference." By definition, such evidence can be viewed in only one light, and reasonable jurors can reach only one conclusion from it. Jurors are not free to reach a verdict contrary to such evidence; indeed, uncontroverted issues need not be submitted to a jury at all.
> …
> Most often, undisputed contrary evidence becomes conclusive (and thus cannot be disregarded) when it concerns physical facts that cannot be denied.
> …
> It is impossible to define precisely when undisputed evidence becomes conclusive. … Evidence is conclusive only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case.
>
> There is another category of conclusive evidence, in which the evidence is disputed. Undisputed evidence and conclusive evidence are not the same—undisputed evidence may or may not be conclusive, and conclusive evidence may or may not be undisputed.
> …
> Proper legal-sufficiency review prevents reviewing courts from substituting their opinions on credibility for those of the jurors, but proper review also prevents jurors from substituting their opinions for undisputed truth.

*City of Keller,* 168 S.W.3d at 802 (footnotes and citations omitted).

In *Uniroyal,* the supreme court held that the jury was not bound by expert testimony that a tire rim design was unreasonably dangerous. *See Uniroyal,* 977 S.W.2d

at 339 ("We conclude that the jury could properly determine whether the rim as designed was unreasonably dangerous, and that it was not required to follow expert testimony on this issue."); *see also Hinson,* 172 S.W.3d at 118 & n.3 (discussing *Uniroyal* and case law preceding and succeeding it, and noting that "*Uniroyal* is one of a multitude of cases under Texas law in which expert testimony regarding a subject was not binding on the jury").  Thus, while the Hunters were required to present expert testimony on design defect, including safer alternative design and producing cause, that requirement does not translate into such expert testimony, even if uncontroverted, being conclusive and binding on the jury, which alone determines if the product is unreasonably dangerous and a producing cause.  *See Uniroyal,* 977 S.W.2d at 339; *Rentech Steel,* --- S.W.3d at ---, 2009 WL 2466890, at *2-3; *see also City of Keller,* 168 S.W.3d at 820 ("Even uncontroverted expert testimony does not bind jurors unless the subject matter is one for experts alone.") (citing *Uniroyal*).

*The Evidence*

We next detail the critical evidence under review.  The alleged design defect in the truck and the Hunters' theory of the fire that killed Bob Hunter are as follows:

- The 1999 Ford F-350 diesel truck uses a two-battery, 12-volt electrical system. One battery is located toward the front of the engine compartment on the driver's side, and the other is located toward the front of the engine compartment on the passenger side.  The two batteries are connected in parallel by a single cable that does not contain fuses.  The actual copper wiring of the cable is inside a corrugated plastic sheath and is also insulated.

- The battery cable connecting the two batteries is routed behind and near the top of the radiator in the front of the engine compartment and goes under the metal radiator mounting brackets.  In the previous model year, the cable was routed above the radiator framing member.

- This area in the front of the engine compartment is specifically designed as a crush zone to absorb energy in frontal collisions, which are foreseeable events at highway speeds.

- In Bob Hunter's collision with the Toyota truck, the impact crushed the front of Hunter's truck and the electrical current in the battery cable started the post-collision fire in the engine compartment when the cable's exposed copper wiring core touched a steel lug wrench stored in the engine compartment and arced, melting or welding the copper wire to the lug wrench.

- Specifically, from the violent impact, the metal radiator bracket cut into and scraped the battery cable. The bracket cut through the cable's plastic sheath and stripped away the insulation, thus exposing the copper wiring core of the cable.

- As Hunter's truck turned onto the driver's side, the passenger-side battery came out of its tray and swung the cable in a way that draped the exposed copper wiring core over the lug wrench.

- The contact between the exposed copper wiring core of the cable and the lug wrench caused an electrical short and arcing that ignited the cable's plastic sheath, which started the fire in the engine compartment and spread to the passenger compartment, where Hunter was trapped.

The Hunters' experts whose testimony supported the above synopsis were:

- James Mundo, an automotive design engineer and crashworthiness expert, who testified that routing the battery cable in the crush zone and next to the radiator bracket was a design defect that was unreasonably dangerous.

- Lewis Fitch, an electrical engineer, who testified that the battery cable at issue could start a fire by arcing. Fitch performed an experiment with an exemplar battery cable, charged it with new automobile batteries, and applied the cable's exposed copper core to a grounded metal plate in an effort to start a fire. Despite placing "sparking lubricant" on the metal plate, in four tests Fitch obtained a small flame on the insulation only once and for just a few seconds.

- Cam Cope, an accident reconstruction expert, who testified about the cause and origin of the fire, opining that it started when the stripped cable draped over the lug wrench.

- Gene Haynes, an electrical engineer, who testified that the fire started when the battery cable arced against the lug wrench. He also testified about two safer

alternative designs: an inertia cut-off switch to disconnect the power to the battery cable in the event of a collision, or re-routing the battery cable or providing more protective shielding to it. Haynes conceded that no other American vehicle manufacturer uses a cut-off switch for the battery power.

None of the Hunters' experts were aware of a similar incident involving a battery cable starting such a vehicle fire.

The Hunters' theory was based on the fire starting on the battery cable in the front of the engine compartment. Volunteer fireman David Williams testified that when he arrived at the scene of the collision, he observed fire coming out from under the right front of the truck's hood, which was the highest point of the front of the truck because it was turned over onto the driver's side. The flame that he first saw was a one-foot to eighteen-inch flame, and he opined that the fire started from the front of the truck and moved toward the cab.

Pam and Larry Shields, the couple who stopped at the scene, testified differently than Williams about where they saw the fire originating. Pam saw smoke coming from under the hood, but the first flames she saw were coming up from behind and below the truck's cab, not from in front of Hunter. Larry said that the flames started "kind of underneath" and at the middle of the truck, and they progressed forward. Cope was cross-examined about another person's investigative report in Cope's file that was prepared at the request of the Hunters' attorneys, and he acknowledged that it contained consistent statements from Pam Shields about where she first saw flames and that the report "concluded that the fire appeared to start under Hunter near the engine area."

We hold that, even if we disregard Ford's expert testimony, the Hunters did not conclusively prove their design-defect claim as a matter of law. A reasonable jury could have disbelieved the Hunters' experts' theory as to how the fire started, either because of the disputed testimony among the fact witnesses about where the fire started, or because they found the Hunters' experts or their theory not to be credible. Also, a reasonable jury could have disbelieved the Hunters' experts' proposed safer alternative designs, or it could have believed that the truck was not unreasonably dangerous, based on the record as a whole. *See Uniroyal,* 977 S.W.2d at 339. In sum, a reasonable jury could have found that the Hunters did not meet the burden of proof on their design-defect claim. We also hold that the jury's "no" answer on the design-defect question is not so against the great weight and preponderance of the evidence to be clearly wrong and manifestly unjust. We overrule issues two and three.

### Jury Misconduct

In their first issue, the Hunters claim that they are entitled to a new trial because of misconduct on the part of one juror. During voir dire, the panel was told that the case involved a 1999 Ford F-350 with a 7.3 liter diesel engine. Both sides asked the panel questions about their ownership of Ford vehicles, including specifically a Ford truck, and Roscoe Lamb, who was panel member 28, did not respond to those questions. Lamb was seated as the twelfth juror.

Tracy Johnson, the Hunters' attorney, filed an affidavit with a motion for new trial alleging the following: After the trial, Johnson telephoned the jurors for feedback. In his conversation with Lamb, Johnson learned that Lamb owns and drives a Ford

truck with the same 7.3 liter diesel engine as the Hunter truck.  Lamb would not tell Johnson why he did not disclose in voir dire that he owned a similar Ford truck.

Johnson then obtained state title and registration information for Lamb, and those documents show that Lamb owns a 2003 Ford F-250 truck, which Johnson says has a 7.3 liter diesel engine and the same alleged design defect as the Hunter truck.  The state records also showed that Lamb's wife owns a Ford, and that too was not disclosed in voir dire.

Johnson's affidavit further states that, during the trial testimony of James Mundo, one of the Hunters' experts, Lamb asked to see a demonstrative metal bracket (apparently the one that the Hunters' experts opined cut the battery cable) that Mundo was discussing.  The bracket was passed around to the jurors.  (The reporter's record reflects this occurrence, but it does not identify the juror.)  According to Johnson, after Lamb examined the bracket, he "sat back, took no notes, nor asked to see any other items."  Johnson's affidavit concludes: "Had I been aware of Mr. Lamb's ownership of a Ford truck with the same defect at issue in the lawsuit, I could have asked about his bias in favor of Ford and raised a cause challenge if warranted.  Had the challenge not been granted, I would have used one of my remaining peremptory challenges to excuse him."

Among the grounds in the Hunters' motion for new trial was juror misconduct relating to Lamb's alleged concealment.[1]

---

[1] The Hunters' insinuation is that Lamb was a "stealth juror."  A stealth juror is a "juror who hides a potentially disqualifying bias or conflict of interest in order to serve on a jury.  A stealth juror may want to influence the outcome of the trial. …"  BLACK'S LAW DICTIONARY 873 (8th ed. 2004).

Rule of Civil Procedure 327 provides:

> a. When the ground of a motion for new trial, supported by affidavit, is misconduct of the jury or of the officer in charge of them, or because of any communication made to the jury, or that a juror gave an erroneous or incorrect answer on voir dire examination, the court shall hear evidence thereof from the jury or others in open court, and may grant a new trial if such misconduct proved, or the communication made, or the erroneous or incorrect answer on voir dire examination, be material, and if it reasonably appears from the evidence both on the hearing of the motion and the trial of the case and from the record as a whole that injury probably resulted to the complaining party.

> b. A juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict concerning his mental processes in connection therewith, except that a juror may testify whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

TEX. R. CIV. P. 327.

After a hearing, the trial court denied the motion and, despite the Hunters' request, did not make and file findings of fact and conclusions of law.[2] The only evidence presented at the hearing was Johnson's affidavit; Lamb did not testify. *See Golden Eagle Archery, Inc. v. Jackson,* 24 S.W.3d 362, 370 (Tex. 2000) (noting that juror who allegedly gave incorrect answer during voir dire to conceal bias could have been called to testify at hearing on motion for new trial); *General Accident Fire & Life Assurr. Corp. v. Coffman,* 326 S.W.2d 287, 291-92 (Tex. Civ. App.—Waco 1959, writ ref'd n.r.e.) (juror

---

[2] The Hunters do not raise as an issue the trial court's failure to make and file findings and conclusions. The trial court may file, but is not required to file, findings and conclusions on a motion for new trial alleging jury misconduct. *See Woodward v. Higdon,* 643 S.W.2d 470, 471 (Tex. App.—Waco 1982, writ ref'd n.r.e.).

testified at hearing on motion for new trial on juror's concealment of similar injury as

plaintiff's).

> To warrant a new trial for jury misconduct, the movant must establish (1) that the misconduct occurred, (2) it was material, and (3) probably caused injury. Rule 327 provides that a trial court:
>
> > may grant a new trial if ... the erroneous or incorrect answer on voir dire examination, be material, and if it reasonably appears from the evidence both on the hearing of the motion and the trial of the case and from the record as a whole that injury probably resulted to the complaining party.
>
> TEX. R. CIV. P. 327(a). Whether misconduct occurred and caused injury is a question of fact for the trial court. *See Pharo v. Chambers County,* 922 S.W.2d 945, 948 (Tex. 1996). Absent findings to the contrary, we must assume that the trial court made all findings in support of its decision to deny the motion for new trial. *See id.*

*Golden Eagle,* 24 S.W.3d at 372. We review the trial court's denial of the Hunters' motion

for new trial on jury misconduct for abuse of discretion. *Pharo,* 922 S.W.2d 948-49;

*Mercado v. Warner-Lambert Co.,* 106 S.W.3d 393, 396 (Tex. App.—Houston [14th Dist.]

2003, pet. denied).

We need not decide if juror Lamb committed jury misconduct because we

determine that the Hunters cannot show that injury probably resulted from the

misconduct, if it occurred.

> To show probable injury, there must be some indication in the record that the alleged misconduct most likely caused a juror to vote differently than he "would otherwise have done on one or more issues vital to the judgment." *Mrs. Baird's Bread Co. v. Hearn,* 157 Tex. 159, 300 S.W.2d 646, 649 (1957). There is no probable injury when "the evidence is such that ... the jury would in all probability have rendered the same verdict that was rendered here, ..." *Fountain*[ *v. Ferguson,* 441 S.W.2d 506, 508 (Tex. 1969)] (quoting *Lumbermen's Lloyd's v. Loper,* 153 Tex. 404, 269 S.W.2d 367 (1954)).

*Redinger v. Living, Inc.,* 689 S.W.2d 415, 419 (Tex. 1985). Here, the verdict was unanimous, and there is no evidence that the alleged misconduct affected the outcome. If someone other than Lamb had been the twelfth juror and had voted for the Hunters' position, the same verdict, albeit 11 to 1 instead of unanimous, would have been rendered. *See id.; Williams v. Viswanathan,* 64 S.W.3d 624, 637 (Tex. App.—Amarillo 2001, no pet.) ("In this case there was a unanimous verdict. Therefore, even if Jane Doe's vote was not counted, there would have been 11 votes to support the verdict. Reversal is not required by jury misconduct when the verdict would be supported by the required ten jurors".) (citing *Redinger,* 689 S.W.2d at 419); *see also Sharpless v. Sim,* 209 S.W.3d 825, 828 (Tex. App.—Dallas 2006, pet. denied) ("There is also no probable injury because Harrison's vote did not alter the outcome, and was therefore not vital to the judgment. … But even if Harrison had agreed with the majority, the final verdict would simply have been 11-1 in favor of plaintiffs rather than 10-2. Jury misconduct does not require reversal when the verdict would be supported by ten of the twelve jurors required to render a verdict.") (citing *Williams,* 64 S.W.3d at 637).

In *Coffman*, the authority principally relied on by the Hunters to show probable injury, fifty years ago we applied a much lighter burden to show probable injury in a case where the juror testified at the hearing on the motion for new trial on jury misconduct:

> Surely the appellant had the right to know of each member of the jury panel whether or not he or she had sustained at any time a back injury in order that he might properly exercise his challenges for the benefit of his client. It is obvious that no one could reasonably speculate as to the effect

on the ultimate outcome of this cause had the appellant had an unbiased juror sitting in the place of the juror, Long. Appellant was entitled to have its cause submitted to twelve men who were fair and unbiased by previous experience and its attorney's effort to obtain such treatment for his client was denied through no fault of the attorney. We are of the view under this undisputed factual situation that no heavy burden or unreasonable burden should be placed upon defendant to show probable harm.

*Coffman*, 326 S.W.2d at 292.

We read *Coffman* as an anomaly that was decided, as the opinion thrice reiterates, on the "undisputed factual situation" of the juror, who testified that his own undisclosed similar injury influenced his vote. *See id.* It was that "undisputed factual situation" that led the court in *Coffman* to distinguish, and thus to not apply, the otherwise admittedly controlling case law at the time regarding probable injury. *See id.* (citing *Childers v. Texas Employers' Ins. Ass'n*, 154 Tex. 88, 273 S.W.2d 587 (1954); *Thompson v. Quarles*, 297 S.W.2d 321 (Tex. Civ. App.—Galveston 1956, writ ref'd n.r.e.); and *Houston Belt & Terminal Ry. v. Burmester*, 309 S.W.2d 271 (Tex. Civ. App.—Houston 1957, writ ref'd n.r.e.)). Thus, we view *Coffman* as being limited to its unique facts, and we furthermore doubt that its lighter burden on probable injury survives *Redinger* and its progeny, such as *Williams* and *Sharpless*.

The Hunters also contend that the excessive speed in which the jury reached its verdict (forty minutes) shows probable injury from Lamb's alleged misconduct. They argue in their reply brief:

The jury's actions in this case are best explained as being due to Lamb's concealed bias. This is what is most likely. There is no way any reasonable jury could have returned a verdict so quickly that was so

against the weight of the evidence without the concealed bias having caused harm.

The Hunters first cite *Carson v. Texas Pipe Line Co.,* 59 S.W.2d 328 (Tex. Civ. App.—Fort Worth 1932, writ dism'd), in support of their contention, but we agree with Ford that *Carson* is factually and legally inapposite. They next cite *Reese v. Brittian,* 570 S.W.2d 528 (Tex. Civ. App.—Amarillo 1978, writ ref'd n.r.e.), which states that, among other factors, the duration of jury deliberations is a factor to consider in determining probable harm from jury misconduct. *See id.* at 533 (citing Jack Pope, *The Mental Operations of Jurors*, 40 TEXAS L. REV. 849, 865-66 (1962)). The referenced law review article does not support that proposition; it merely states, without citation to authority, that the duration of deliberations can be an overt act of jury misconduct. *See* Pope, 40 TEXAS L. REV. at 865-66. That scrutiny also applies to the other case relied on by the Hunters. *See Trousdale v. Texas & N.O.R. Co.,* 264 S.W.2d 489, 494-95 (Tex. Civ. App.—San Antonio 1953) (listing overt acts of misconduct that can be inquired about), *aff'd,* 154 Tex. 231, 276 S.W.2d 242 (1955).

No authority supports the Hunters' proposition, and moreover, they additionally would have to have shown a causal link—other than pure speculation—between the alleged misconduct and the speedy deliberations to establish probable injury. *See Redinger,* 689 S.W.2d at 419 ("[t]o show probable injury, there must be some indication in the record that the alleged misconduct *most likely caused* a juror to vote differently") (emphasis added); *Doucet v. Owens-Corning Fiberglass Corp.,* 966 S.W.2d 161, 164 (Tex.

App.—Beaumont 1998, pet. denied) ("We cannot manufacture injury by supposition or conjecture.").

Because the trial court could have determined that no injury probably resulted from the alleged misconduct, it did not abuse its discretion in denying the Hunters' motion for new trial on jury misconduct. We overrule their first issue.

Having overruled all of the Hunters' issues, we affirm the trial court's judgment.


        REX D. DAVIS
        Justice

Before Chief Justice Gray,
     Justice Reyna, and
     Justice Davis
Affirmed
Opinion delivered and filed November 10, 2009
[CV06]