NO. 07-00-0414-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

DECEMBER 20, 2001

_____


LINDA WILLIAMS AND JOHN W. WILLIAMS, INDIVIDUALLY
AND AS REPRESENTATIVES OF THE ESTATE OF JOHN
WESLEY WILLIAMS, JR., DECEASED, APPELLANTS

V.

BALUSWAMY VISWANATHAN, M.D., APPELLEE


_____

FROM THE 72nd DISTRICT COURT OF LUBBOCK COUNTY;

NO. 97-560,756; HONORABLE J. BLAIR CHERRY, JR., JUDGE

_____

Before BOYD, C.J., and QUINN and REAVIS, JJ.

In five issues, appellants Linda and John W. Williams, individually and as representatives of the estate of John Wesley Williams, challenge a judgment against them in their suit for medical malpractice against appellee Balluswamy Viswanathan, M.D. Appellants were the parents of John Wesley Williams (John), a 14-year-old special

education student, who suffered near drowning in a swimming pool on May 22, 1995, and was treated by appellee at Methodist Hospital in Lubbock. John died approximately 24 hours after being taken to the hospital.

Initially, appellants challenge this court's overruling of their motion for disqualification and recusal of one of the justices of this court. They also contend that reversible error exists because (1) the trial court submitted two unsupported and cumulative jury instructions, (2) the jury's failure to find that appellee's negligence was a proximate cause of John's death was against the great weight and preponderance of the evidence, (3) the trial court abused its discretion in overruling their motion for new trial based on admitted juror misconduct, and (4) a new trial is required to investigate the discovery of a new death certificate. Disagreeing that reversal is required, we affirm the judgment of the trial court.

In their first issue, appellants except to this court's overruling of their motion for the disqualification and recusal of Justice Quinn. Although they presented several bases for disqualification or recusal in their motion, in this appeal they apparently only attempt to re-assert one basis, *i.e.*, that Justice Quinn has a financial interest in the outcome of this case because he offices at Texas Tech University and serves as an Adjunct Professor there, and appellants have another lawsuit pending against that university. In our opinion overruling appellants' motion, we found that Texas Tech University was not a party to this lawsuit and therefore the issue was not relevant here. In the opinion, we also noted that

2

the type of interest required for disqualification must be of a pecuniary nature so that the judge would gain or lose by the judgment rendered in the case. That interest must not only be capable of valuation, it must be direct, real, certain, and in the subject matter of the case in question. We did not believe that Justice Quinn had a sufficient pecuniary interest to warrant his disqualification. *Williams v. Viswanathan*, No. 07-00-0414-CV, 2001 WL 23151, at 4 (Tex.App.--Amarillo January 8, 2001).

However, appellants assert that free office space is not valueless because, otherwise, Justice Quinn would have to pay rent from his own resources for office space, receive the same benefit from other private sources, or forego his convenience of having a second office in Lubbock. Therefore, they argue, it is in Justice Quinn's financial interest to protect the financial stability of Texas Tech University so he may continue to receive the benefit of a free office. Appellants further posit that we erred in not making our review by determining whether a reasonable member of the public at large, knowing all the facts, could reasonably question the judge's impartiality.

Once again, we point out that Texas Tech University is not a party to this lawsuit. We fail to see how a judgment for or against appellee, who is a physician practicing at Methodist Hospital, would affect the financial stability of Texas Tech University. Even if appellants have a lawsuit pending against Texas Tech University with respect to the death of their son, those issues are not before us, and appellants specifically sought to exclude any evidence at trial as to negligent acts on the part of any persons or entities prior to the

3

time that John arrived at the hospital for treatment. Therefore, even assuming arguendo that there is a pecuniary interest capable of valuation, that interest is not a direct interest in the subject matter of the case in question, and we do not believe that a member of the public would reasonably question Justice Quinn's impartiality. Appellants' first issue is overruled.

In their second issue, appellants complain of the submission of two instructions to the jury which they contend were neither raised by the pleadings nor supported by the evidence and together constitute cumulative instructions. In doing so, they posit that an instruction pursuant to article 4590i of the Medical Liability and Insurance Improvement Act was improper. The challenged instruction is as follows:

> A finding of negligence may not be based solely on evidence of a bad result
> to the patient in question, but such a bad result may be considered by you,
> along with other evidence, in determining the issue of negligence. You shall
> be the sole judges of the weight, if any, to be given to such evidence.

In a jury trial involving a health care liability claim, the court may provide the referenced instruction if it determines the instruction is reasonably applicable to the facts. Tex. Rev. Civ. Stat. Ann. art. 4590i § 7.02(c) (Vernon Supp. 2001). That determination is to be made by the trial court in its sole discretion, and we review that determination under an abuse of discretion standard. *Id.*

Appellants rely on *Irick v. Andrew*, 545 S.W.2d 557 (Tex.Civ.App.--Houston [14th Dist.] 1976, writ ref'd n.r.e.), *overruled on other grounds by Haddock v. Arnspiger,* 793

4

S.W.2d 948 (Tex. 1990), for the proposition that where there is evidence that the physician committed some acts of negligence, an instruction regarding a bad result is improper. In *Irick*, the instruction given was as follows: "You are instructed that an unexpected result, bad result, failure to cure, or any other circumstance showing merely a lack of success, is not evidence of negligence on the part of the defendant physician; negligence cannot be inferred solely from a failure to cure or unexpected result." *Id.* at 558-59. In finding that the submission of the instruction was error, the appellate court noted that there was some evidence that the doctor there had administered an improper dosage of radiation. Because the jury was entitled to consider the radiation burn along with the other evidence in determining the question of the doctor's negligence, and the instruction did not tell them that, the appellate court held that it was "an improper statement of the law as applied to this case." *Id.* at 559. However, here, contrary to *Irick*, the instruction specifically informed the jury they could consider a bad result along with other evidence in determining negligence. That being so, the objectionable portion of the instruction in *Irick* has been cured in the instruction given here.

Appellants also contend there was no evidence to support the instruction because it was undisputed that appellee committed negligent acts. We disagree. While appellants' expert testified to a number of acts of negligence assertedly committed by appellee including, among others, treating the patient with Dopamine, decreasing the dosage of Lasix, failing to lower his positive end expiratory pressure (PEEP), difficulty in placing lines in the patient causing pneumothoraxes, and puncturing the patient with a trocar, appellee

5

called two expert witnesses who testified he was not negligent in his treatment. Additionally, although appellee acknowledged that John's condition worsened under his care, he denied that he was negligent in his treatment. Thus, there was evidence to support the submission of the instruction. Furthermore, appellee specifically pled that John's death was not caused by his negligence. Under this record, the trial court did not abuse its discretion in submitting the instruction to the jury.

Appellants also objected to the instruction on unavoidable accident. Once again, they argue the instruction was not supported by the pleadings and the evidence. The instruction read: "An occurrence may be an 'unavoidable accident,' that is, an event not proximately caused by the negligence of any party to it."

The purpose of an unavoidable accident instruction is to inform the jury that, although conduct may have been negligent, it must produce the outcome of which the party complains. *Crawford v. Hope*, 898 S.W.2d 937, 941 (Tex.App.--Amarillo 1995, writ denied). Further, the instruction has been historically used in medical malpractice cases if there is some evidence first presented that the event was caused by some condition other than the negligence of the parties. *Hill v. Winn Dixie Texas, Inc.,* 849 S.W.2d 802, 803 (Tex. 1992); *Crawford*, 898 S.W.2d at 941; *Wisenbarger v. Gonzalez Warm Springs Rehabilitation Hosp., Inc.,* 789 S.W.2d 688, 692 (Tex.App.--Corpus Christi 1990, writ denied).

6

Appellee specifically pled that John's death was not caused by the negligence of any party to the case, but that "[i]t was an accident." At a pretrial hearing, the court ruled that it would not permit evidence of unavoidable accident prior to the presentation of the decedent to medical personnel. However, there was expert testimony at trial that John had a "catastrophic lung injury" at the time he arrived at the hospital and that his chances of living were about five percent. Further, there was testimony that the cause of death was due to the severity of his lung injury and the inability to overcome the damage placed on his entire body by that injury. Additionally, appellee's medical experts went through various alleged acts of negligence and testified the acts were not negligent and were not the proximate cause of John's death. Although appellants' expert disagreed with some of these statements, this is still some evidence that the death was caused by a condition or other physical circumstances than the negligence of the parties.

Even so, appellants contend that, even if the pleadings and proof support the submission of the unavoidable instruction, the instruction was improper because it impermissibly confused the jury by improperly commenting on the weight of the evidence. They argue that such an instruction should only be used in situations "involving instantaneous events or occurrences arising as a result of conditions or circumstances which exist at a particular point in time." *See Wisenberger,* 789 S.W.2d at 694. However, we note that in *Crawford,* the court declined to find such an instruction was improper merely because it may have constituted some comment on the evidence. Rather, the court opined, although the submission of an instruction implicitly tells the jury that some

7

evidence exists to support the proposition, if it does not inform the jury that one party's evidence is more credible than the other party's evidence, it may be submitted. *Crawford*, 898 S.W.2d at 941-42.

The *Wisenbarger* court found such an instruction to be unnecessary to aid the jury because the expert witness testimony from both parties was that the standard of care provided was equal to or above the standard of care provided in the community. However, the court also intimated, without so finding, that if the evidence had not been so one-sided, the unavoidable instruction could have confused or misled the jury. *Wisenbarger*, 789 S.W.2d at 694. The teaching of this discussion seems to be that if the evidence on negligence is conflicting, such an instruction may be necessary to aid the jury, even though it might possibly confuse or mislead them. In such instances, the submission of such instructions are left to the discretion of the trial court.

Furthermore, to constitute an improper comment on the weight of the evidence, the instruction must suggest to the jury the trial court's opinion on the matter. *Whiteside v. Watson*, 12 S.W.3d 614, 624 (Tex.App.--Eastland 2000, pet. denied); *Harris v. General Motors Corp.,* 924 S.W.2d 187, 188 (Tex.App.--San Antonio1996, writ denied); *City of Amarillo v. Langley,* 651 S.W.2d 906, 915 (Tex.App.--Amarillo 1983, no writ). In this instance, the instruction did not direct the jury that one party's evidence on negligence was more credible than the other party's evidence. Thus, the trial court's action in submitting the issue was not arbitrary or unreasonable, *i.e.*, not an abuse of its discretion.

Finally, appellants contend that even if the submission of the instructions on "bad result" and "unavoidable accident" were each individually proper, the cumulative effect of the submission of both instructions, which rely on the same evidentiary support, resulted in an impermissible comment on the weight of the evidence. Appellants cite no authority with respect to that contention, nor have we found any such authority in a medical malpractice case. However, the instruction on "bad result" is directed to the issue of the existence of negligence, while the instruction on "unavoidable accident" is directed to the issue of proximate cause. Thus, although some of the evidence supporting the two instructions is overlapping, the exact same evidence does not necessarily support each instruction.

First, there was a dispute among the medical experts as to whether appellee was negligent at all. Additionally, even in instances in which appellants' medical expert believed there was negligence, he also agreed that some of those instances, such as the difficulty in inserting IV lines and the dosage of Lasix did not result in John's death. There was also no testimony that appellee's alleged negligence in failing to give appropriate pain medication resulted in John's death. Inasmuch as we have determined that the submission of each issue individually was proper, and appellants cite no authority for their proposition that the submission of both issues had a cumulative erroneous effect, we decline to find any abuse of discretion on the part of the trial court. Appellants' second issue is overruled.

In their third issue, appellants contend the evidence is factually insufficient to support the jury's verdict. The jury failed to find that appellee's acts were the proximate cause of John's death. In our review, we must examine the entire record to determine if any evidence supports the jury's finding and then determine if, in light of all the evidence, the finding is manifestly unjust. *Traylor v. Goulding*, 497 S.W.2d 944, 945 (Tex. 1973).

Appellants argue that the evidence was "undisputed that the acts and omissions of Appellee would not have been proper under the same or similar circumstances in the hands of a reasonably prudent physician." We disagree. The issues of whether appellee's acts or omissions were negligent and whether they proximately caused John's death were strongly contested at trial. Because of the nature of appellants' complaint, we will set forth that testimony in some detail.

Dr. Charles Landers, who is board certified in internal medicine, pulmonary medicine and critical care, testified on behalf of appellants, and averred that appellee was negligent in his treatment of John, which caused his death. This was the case, the doctor reasoned, because John came in with one problem and when the care being provided him was not effective, in the face of that failure, appellee failed to modify his strategies. Dr. Landers did not believe the lung injury itself was a proximate cause of death. John arrived in the emergency room awake, alert, and conscious with unlabored breathing. Further, his vital signs were acceptable. Dr. Landers also discussed a study in which 121 near

10

drowning patients were awake, alert, and oriented when they presented to hospitals, and all of those patients survived.

He reviewed John's x-ray taken in the emergency room and opined that, although John's lungs had been injured, it did not mean he was going to die. When an x-ray is abnormal, the oxygen is low and the lungs are stiff, indicating adult respiratory distress syndrome (ARDS). A patient with ARDS needs supportive care. The doctor did not believe that either the vomiting of material from John's stomach or the fact that, when John was taken off oxygen his oxygen saturation fell to 77%, meant that John was going to die. Dr. Landers also opined that the fact the medical records show appellee came to the emergency room 15 minutes before he actually saw John indicate appellee was negligent. Moreover, a 35-minute delay before intubation would, in his opinion, constitute negligence for a deteriorating patient. Further, because the medical records show that appellee attempted intubation twice before being successful, appellee was negligent because there should have been no difficulty in intubating him. Additionally, it was below the standard of care to give a too low a dose of Lasix. John's oxygen saturations remained at the level desired by appellee most of the time, which was an appropriate level. However, they decreased when appellee punctured both lungs trying to insert lines.

The medical records also indicate there were multiple attempts to insert IV lines in multiple locations, which Dr. Landers believed was below the standard of care, because insertion of those lines is a routine motor skill. The fact that another doctor was able to

place a central line on the first attempt indicated that someone with reasonable skills should have been able to do so fairly easily. He further criticized appellee for sticking both sides of the chest with needles unsuccessfully without taking a chest x-ray in between those actions because of the need to make sure a lung had not collapsed. Dr. Landers believed that appellee punctured the left lung first and then the right lung, which was below the standard of care. He also opined that when appellee attempted to insert a chest tube with a trocar to re-expand the lung, it caused further injury to the lung, resulting in bleeding out through the tube. That action was also below the standard of care. Further, x-rays indicated that John had a pneumomediastinum and, in spite of the chest tube, the pneumothorax persisted. Dr. Landers believed that the chest tubes were too small. In spite of all of these incidents, John was maintaining adequate oxygen saturation. However, Dr. Landers criticized appellee for not giving pain medication to John early enough, and when he finally prescribed Morphine, for giving too low of a dose, causing John to suffer an extreme amount of pain.

PEEP greater than 15 can cause pressure on the heart and lungs and decrease venous return, which in turn decreases cardiac output and results in less oxygen to the tissues and acidosis. Dr. Landers believed that is what happened to John. He agreed with the death certificate that the immediate cause of death was cardiac arrest. The excessive PEEP caused John's blood pressure to be low. Cardiac output should have been measured by insertion of a Swan-Ganz catheter to get repeated measurements. The risk of insertion would have been small and, in Dr. Landers's opinion, it was below the standard

12

of care not to do so and was a proximate cause of death. Appellee chose to give John fluid and Dopamine, neither of which kept his blood pressure up and, without the monitoring provided by the catheter, he could not have known whether John needed more fluid or not. However, the records indicate John did not need fluid. Dr. Landers is not aware of any patient ever dying from a breathing problem who had oxygen levels and PO2 levels such as John. By the time John was close to death, he still had oxygen levels sufficient to sustain life. If appellee had treated John appropriately, it was the doctor's opinion that he would have been supported through his acute injury and his lungs would have recovered.

On cross-examination, Dr. Landers admitted he did not know how many of the 121 patients from the study he cited had ARDS. He also agreed that John's initial x-ray was dramatically abnormal. He believed that John was in "dire straits" and in full respiratory failure by the time he was intubated. He admitted he occasionally had trouble placing IV lines and that the IV's did not cause John major problems. He further admitted in his deposition that he did not believe the Lasix given to John caused him any harm. One of the things that can cause a pneumothorax is barotrauma, which can be caused by mechanical ventilation. He admitted that it was possible that John's pneumothorax was caused by barotrauma. There was also no notation in the autopsy report of any injury to John's lungs caused by a trocar. Dr. Landers agreed that giving a narcotic can lower blood pressure, and he additionally agreed that it is the treating physician's responsibility to determine the parameters for giving pain medicine.

In contrast, Dr. Thomas Petty, a specialist in internal and pulmonary medicine, testified on behalf of appellee. He stated that the notes of the emergency medical personnel showed that the decedent's heart had stopped and he later started coughing up bloody sputum. That symptom indicated a very severe lung injury, and John's oxygen saturations indicated the same thing. The x-ray taken after John arrived at the hospital was characteristic of ARDS. It was the x-ray of a "catastrophic lung injury." At that point, John's predictable outcome was less than a 5% chance of survival. John was also suffering from pulmonary edema.

Dr. Petty further testified that when the lungs are severely injured, a huge amount of inflammatory processes are delivered throughout the body and they affect every organ of the body. He believed that appellee raised the decedent's PEEP to an appropriate level in order to maintain as much oxygen transfer across the lungs as possible. He did not agree that high PEEP caused decreased cardiac output leading to cardiac arrest. He felt the heart problems were caused by ARDS. He also did not believe that acidosis caused death. He averred that the decedent died "as a consequence of drowning, near drowning, which set forth a chain of events that led to the development of the acute respiratory distress syndrome because of an overwhelming lung injury, and he died not because of his medical management, but he died because of the severity of his lung injury and the inability to overcome the damage that had been placed on John's – not only John's lungs but John's whole body."

14

On cross-examination, Dr. Petty admitted that John was awake, alert, oriented, and breathing on his own with the assistance of oxygen when he arrived in the emergency room. He also admitted that John suffered a pneumothorax after appellee attempted to place a subclavian line and had his intercostal artery hit during the insertion of a chest tube with a trocar. He further agreed that when the PEEP is greater than 15, in some circumstances there could be pressure placed on the heart which decreases venous return and cardiac output. If the tissues do not get enough oxygen, they become acidotic, leading to cardiac arrest, which was the final cause of death. Additionally, Dr. Petty admitted that a reasonable physician could have concluded that John had low cardiac output due to too high a PEEP. However, he disagreed with that conclusion in this instance. Dr. Petty denied that insertion of a Swan-Ganz catheter to measure cardiac output was the appropriate standard of care. He also denied that there could not have been a medical reason to increase the PEEP.

On redirect, Dr. Petty testified that he believed the heart was suppressed by the products of inflammation. Appellee was attempting to dry the heart by giving fluid to improve the circulating blood volume and giving Dopamine to dry the heart, which was appropriate. The PEEP was necessary to keep him alive. The pneumothorax was caused by the underlying lung injury and, because of the necessary pressure to keep him alive, the weak supports in his lungs blew out.

Dr. Brett Giroir, a pediatric intensive care specialist, also testified for appellee. He stated that by the time that appellee saw John, he "was really in dire circumstances." The amount of oxygen in his body was very low and he had severe pulmonary edema. He believed John was moments from death when appellee saw him. At that time, John already had ARDS. He opined that appellee clearly operated within the standard of care of a pediatric intensivist.

In response to an allegation that more than one attempt was necessary to intubate John, Dr. Giroir testified that the records show that when appellee first attempted to insert the tube, there were fluids which had to be suctioned out of the airway prior to the tube being placed. He also stated that, in his opinion, Lasix probably was not going to help John, but many physicians do give Lasix because there is a slight chance it may help and probably will not hurt the patient. In response to complaints that appellee had difficulty placing some IV lines, Dr. Giroir said that many times a line cannot be inserted on the first try. Furthermore, in emergency situations, there is no time to work on one particular vein, so attempts are made with multiple sticks. He further averred that central lines are difficult to insert and, while many times they can be inserted on the first try, many times it takes multiple tries. Additionally, John was too sick to be placed in the best position for insertion, which was with the feet above the head. It is within the appropriate standard of care not to give the patient Morphine, which can lower blood pressure, as long as a sedative such as Ativan is given, which was prescribed by appellee.

16

Dr. Giroir opined that it was appropriate for appellee to perform a bilateral needle thoracostomy at the time he did. It was also mandated that he insert chest tubes, which he did. The chest tubes were properly placed according to the chest x-ray. If the lung had been injured by use of a trocar, it should have been noted on the autopsy report, which it was not. Dr. Giroir further felt that appellee used an appropriate size of chest tube. John had a pneumomediastinum, which means there is air tracking through the injured lungs into the mediastinum which can evolve into a pneumothorax. Other causes of a pneumothorax can be the placement of a central line or the existence of ARDS with a very injured lung containing inflammation. He could not tell which of these was the cause of John's pneumothorax. The fact that, after the placement of chest tubes, John continued to have a pneumothorax does not indicate an unsatisfactory standard of care, because it is not uncommon not to be able to drain all of the air.

It was appropriate for appellee to give fluid for John's low blood pressure to augment the circulation and to give Dopamine to help the heart contract better. Further, he opined, it was appropriate to raise John's PEEP to 18 in order to raise it to a point where the lungs start to open so the amount of oxygen in the blood increases. Appellee started with a low PEEP, which must be dialed up until the desired response is achieved. At lower levels, John did not respond well. It is not the standard of care to place a Swan-Ganz catheter in pediatric patients because it is high risk and it has never been shown that placing the catheter improves the outcome. However, it is an option depending on the circumstances. He did not believe that the level of PEEP decreased the cardiac output,

causing acidosis and cardiac arrest.  The PEEP should have helped the cardiac output in this instance by causing the blood vessels in the lungs to relax.  John died because of the bad inflammation or poisons from his body circulating in the system.

On cross-examination, Dr. Giroir stated that a reasonably prudent physician would not have concluded that high PEEP led to cardiac arrest.  However, he admitted he would have treated John differently by inserting a pulmonary artery catheter, although it is not the standard of care around the country.  No patient in which he has inserted such a catheter has died.  He did not agree that the first priority upon appellee entering the hospital was to necessarily see John.  Appellee may have wanted to review the x-ray and talk to the emergency room physician who treated John prior to seeing him.  He admitted John's low blood pressure could have been caused by decreased cardiac output.  One way to increase venous return is to decrease high levels of PEEP; however, in other circumstances, by increasing volume.

On redirect, he stated that although John's oxygen saturations were normal, that fact does not mean the lungs are working well.  He believed the high PEEP should have helped increase the cardiac output in this instance, because an echocardiogram did not show the heart was squeezed, the oxygen went up in the blood, and the lung mechanics were improved. The first real signs of acidosis did not occur until about ten minutes before John went into cardiac arrest.  He opined that it is not uncommon to nick an intercostal vessel when a chest tube is inserted, so the bleeding experienced by John probably

resulted from that. If a pulmonary artery had been hit, John would have died within moments.

Thus, the evidence shows that contrary to appellants' assertions of undisputed testimony, the evidence was conflicting as to whether appellee acted negligently and as to whether those actions, if any, resulted in John's death. Given the conflicting testimony, it was within the province of the jury to resolve those conflicts. The decision of the jury was not against the great weight and preponderance of the evidence, and we overrule appellants' third issue.

In their fourth issue, appellants contend the trial court abused its discretion by overruling their motion for new trial because of admitted juror misconduct. The final judgment was signed on June 9, 2000. Appellants' motion for new trial was filed on July 10, 2000, which was within the required 30-day period. *See* Tex. R. Civ. P. 329b(a). In that motion, appellants did not raise the issue of juror misconduct. However, one of the basis of the motion was that the verdict was against the great weight and preponderance of the evidence.

On August 17, 2000, appellants filed a supplemental motion for new trial on the basis of juror misconduct. Although appellee asserts that the supplemental motion was not timely filed, appellants argue that the issue of juror misconduct was directly related to the issue of lack of evidence in the record to support the verdict.

19

Amended motions for new trial must be filed before any preceding motion for new trial has been overruled and within 30 days after the judgment is signed. Tex. R. Civ. P. 329b(b). Any motion or amendment filed after expiration of 30 days is untimely and cannot be considered by the trial court or appellate court. *Bell v. Showa Denko K.K.,* 899 S.W.2d 749, 757 (Tex.App.--Amarillo 1995, writ denied). To the extent that a supplemental motion may be different from an amended motion for new trial, the same rule applies. *Voth v. Felderhoff,* 768 S.W.2d 403, 412 (Tex.App.--Fort Worth 1989, writ denied). Furthermore, an argument of insufficient evidence to support a verdict may be premised on factors other than juror misconduct, and appellants contended in their supplemental motion for new trial that the evidence of juror misconduct was newly discovered. Therefore, they argue, it could not have formed a basis of their original motion for new trial.

However, even if it could be said that appellants raised the issue of juror misconduct in their original motion for new trial, we do not believe the trial court acted improperly in overruling the motion on that basis. Juror Jane Doe testified that she is now in a romantic relationship with one of appellants' trial counsel. She did not tell appellants' counsel about her juror misconduct until after she began dating him. She averred that while serving on the jury, she spoke by telephone to a friend of hers who is a doctor. Prior to that conversation, she said she had determined she would find appellee negligent and that his negligence proximately caused the death of John. She explained to her friend the main points why she believed appellee was negligent, but in the telephone conversation, he refuted each of her arguments. As a result of that conversation, she said, by the time the

20

jury voted, she had reversed her previous position on negligence. Instead of basing her decision on what was testified to at trial, she based her decision on the information provided by her friend. At the hearing, when she attempted to go further and testify as to what she had told the other jurors, in the hope they would not find appellee negligent, appellee's objection was sustained by the trial court.

Rule 327 of the Rules of Civil Procedure provides:

a. When the ground of a motion for new trial, supported by affidavit, is misconduct of the jury or of the officer in charge of them, or because of any communication made to the jury, or that a juror gave an erroneous or incorrect answer on voir dire examination, the court shall hear evidence thereof from the jury or others in open court, and may grant a new trial if such misconduct proved, or the communication made, or the erroneous or incorrect answer on voir dire examination, be material, and if it reasonably appears from the evidence both on the hearing of the motion and the trial of the case and from the record as a whole that injury probably resulted to the complaining party.

b. A juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict concerning his mental processes in connection therewith, except that a juror may testify whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

Tex. R. Civ. P. 327. Furthermore, Rule 606(b) of the Rules of Evidence provides:

(B) Inquiry Into Validity of Verdict or Indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by

21

a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, a juror may testify: (1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve.

Tex. R. Evid. 606(b). Outside influences about which a juror may testify must originate from sources other than the juror herself. *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 370 (Tex. 2000). Indeed, it has been held that information gathered by a juror does not amount to an outside influence, even if introduced to other jurors specifically for the purpose of prejudicing the jurors' votes. *Soliz v. Saenz,* 779 S.W.2d 929, 932 (Tex.App.--Corpus Christi 1989, writ denied). That being so, the trial court did not err in excluding Jane Doe's testimony with respect to her relaying the information she obtained to the other jurors during the jury deliberations.

To obtain a new trial because of juror misconduct, it must be shown that the misconduct occurred, it was material, and the misconduct resulted in harm. Tex. R. Civ. P. 327(a); *Redinger v. Living, Inc.,* 689 S.W.2d 415, 419 (Tex. 1985). To the extent that Jane Doe's conversation with her friend was an outside influence exerted on her, we do not believe it resulted in harm. There is no probable injury when the jury in all probability would have rendered the same verdict. *Id.* at 419. In this case there was a unanimous verdict. Therefore, even if Jane Doe's vote was not counted, there would have been 11 votes to support the verdict. A verdict may be rendered by the concurrence of ten members of an original jury of 12. Tex. R. Civ. P. 292. Reversal is not required by jury

22

misconduct when the verdict would be supported by the required ten jurors. *See Redinger,* 689 S.W.2d at 419*.* Therefore, appellants' fourth issue is overruled.

In their fifth and final issue, appellants argue that a new trial is required to allow a thorough investigation of a newly discovered death certificate. They allege that, after completion of the trial, they discovered appellee filed a fraudulent death certificate, which had been replaced by the medical examiner. The use of that false death certificate at trial "allowed for confusion of the jury on the issue of the cause of death of John." Further, they argue, appellee allowed appellants to rely on the death certificate in preparing their expert testimony relating to the cause of death. The cause of death on the certificate signed by appellee was "cardiac arrest" due to drowning, while the cause of death on the certificate signed by the medical examiner was "complications of near drowning."

At the hearing on the motion for new trial, appellants offered the affidavit of Robert Byers, the Chief Investigator for the Lubbock County Medical Examiner, in which he stated that since October 1, 1994, Lubbock has operated under a medical examiner system in which only physicians employed by the medical examiner's office may sign a death certificate when the manner of death is not natural. Therefore, appellee was not authorized to sign the death certificate. Appellants also admitted an affidavit from Dr. Charles Landers, their trial expert, in which he stated that his "analysis of the actions of Dr. Baluswamy Viswanathan were premised on the medical records provided to me, including documentation that the cause of death was determined to be cardiac arrest." He

23

further stated that if "the cause of death noted on a valid death certificate had been listed as 'complications from a near drowning incident,' my analysis and testimony for the jury would have had a different focus." Dr. Landers focused his analysis on the effects of high PEEP on the heart since he believed the cause of death to be cardiac arrest. However, he averred, if the cause of death was that shown on the medical examiner's death certificate, he would have focused his analysis on the effect of high PEEP on the lungs.

Appellee testified at the hearing on the motion for new trial and stated that the death certificate was mailed to him. He believed he was to fill it out and sign it. He did so and sent it back in a self-addressed envelope. He had no knowledge that there was a problem with the death certificate until after trial. Although he knew that an autopsy would be done, he did not know that the medical examiner would fill out a death certificate.

To obtain a new trial based on newly discovered evidence, appellants must show that the evidence has come to their knowledge since trial, their failure to discover it prior to trial was not due to the lack of diligence, the evidence is not cumulative, and it is so material that it would probably produce a different result if a new trial was granted. *Jackson v. Van Winkle*, 660 S.W.2d 807, 809 (Tex. 1983). The matter is addressed to the discretion of the trial court and will not be disturbed absent an abuse of discretion. *Id.*

A death certificate is a public document and, if the second one was in fact the official death certificate, it should have been available to appellants prior to trial. Although

24

appellants fault appellee for not knowing that the death certificate he signed was not an official document, if they had been aware of the law, they should have also known to obtain a certificate signed by the medical examiner. Moreover, the cause of death, which appellants contend is newly discovered, is cumulative. The autopsy report which was admitted into evidence also shows the cause of death as complications of near drowning. Therefore, the second death certificate does not add any information not already before the jury.[1] Furthermore, Dr. Landers not only reviewed the death certificate, he also testified at trial he had reviewed the autopsy report. Additionally, he did not claim mere reliance on the cause of death in the death certificate. At trial he stated he agreed with it. That testimony indicated that the doctor had formed his own independent opinion based on his review of the medical records, autopsy report, and deposition testimony. Therefore, in spite of Dr. Landers's assertions that he would have presented different testimony, we fail to see why he should have an opportunity to do so when the same information was available to him in the first trial. There was no abuse of discretion on the part of the trial court in its denial of appellants' motion for new trial on the basis of newly discovered evidence, and appellants' fifth issue is overruled.

In final summary, all of appellants' issues are overruled, and the judgment of the trial court is affirmed.

---

[1]While the first death certificate was discussed at trial, we do not find in the record that it was admitted into evidence.

John T. Boyd
Chief Justice

Publish.