GULF, C. & S. F. RY. CO. v. TEXAS STAR FLOUR MILLS.

(Court of Civil Appeals of Texas. Galveston. Jan. 17, 1912.)

1. CARRIERS (§ 134*)—CARRIAGE OF FREIGHT —ACT OF GOD—EVIDENCE.

In an action against a carrier for damage to freight, evidence held to show that the damage was due directly and exclusively to a storm which could not have been guarded against by any care reasonably to be expected of the carrier, and it was not liable because the occurrence was an act of God.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 592, 607; Dec. Dig. § 134.*]

2. CARRIERS (§ 119*)—CARRIAGE OF FREIGHT LIABILITY—ACT OF GOD.

A carrier is not liable for damages caused by an act of God, when such damages are not contributed to by any negligence of the carrier.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 523–530; Dec. Dig. § 119.*]

3. CARRIERS (§ 119*)—CARRIAGE OF FREIGHT —LIABILITY—"ACT OF GOD."

Where damage to freight was due directly and exclusively to an exceedingly severe windstorm, and no amount of care which could have been reasonably required of the carrier could have prevented the injury, the carrier was not liable, since an occurrence so unusual that it could not have been reasonably expected or provided against is an act of God.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 523–530; Dec. Dig. § 119.*

For other definitions, see Words and Phrases, vol. 1, pp. 118–126.]

4. CARRIERS (§ 119*)—CARRIAGE OF FREIGHT —LIABILITY—ACT OF GOD.

A carrier is not required to procure cars of sufficient strength to withstand a storm which it cannot reasonably anticipate as likely to occur.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 523–530; Dec. Dig. § 119.*]

Appeal from Galveston County Court; Geo. E. Mann, Judge.

Action by the Texas Star Flour Mills

against the Gulf, Colorado & Santa Fé Railway Company. From a judgment for plaintiff, defendant appeals. Reversed and rendered.

Terry, Cavin & Mills, A. H. Culwell, and Rodman S. Cosby, for appellant. Edward F. Harris and Harris & Harris, for appellee.

PLEASANTS, C. J. This suit was brought by appellee against appellant to recover the sum of $119.48, alleged to be the amount of damages to a shipment of flour made by appellee over appellant railway from the city of Galveston to the town of Glen Flora in Wharton county, Tex., on July 21, 1909. Upon the trial in the justice court, in which the suit was originally brought, judgment was rendered in favor of the plaintiff for the amount claimed. The cause was appealed to the county court, and the trial therein resulted in a like verdict and judgment in favor of plaintiff.

[1] The defendant pleaded that the injury to the roof of the car in which the flour was shipped, and the consequent damage to the flour by the rain which flooded the car through the injured roof, was caused by an act of God, for which the defendant could not be held liable. The evidence shows that the flour was shipped by appellee from Galveston to Glen Flora over appellant road on the date alleged, and that, by reason of the fact that the roof of the car in which the shipment was made was partially blown off, the flour was damaged by rain in the amount alleged in the petition. The storm which partially unroofed the car, and thus caused the damage to appellee's flour, occurred on July 21, 1909, and prevailed over a large portion of the Gulf Coast section of the state. The town of Glen Flora, in Wharton county, was near the center of this storm, and the unroofing of the car occurred shortly after the train in which said car was being carried reached Glen Flora on the day before named. The testimony as to the violent and unusual character of this storm is as follows:

William Hood, a merchant of Glen Flora, testified: "The storm of July 21, 1909, was unusually severe, and the wind unusually high at Glen Flora. It was the worst storm experienced in Glen Flora in many years. There was considerable damage done to property in the vicinity of Glen Flora due to the violence of the wind."

C. A. Davis testified: "The weather on the afternoon and night of July 21, 1909, at Glen Flora and vicinity was very stormy—windstorms and rain. The wind was of unusual strength and velocity. I would call same a storm or hurricane. It was an unusual occurrence to me, as I never before was in as bad a storm as that. The roof of the car was partly torn off when it arrived, so I was told by the train crew, as I did not see the car until the following morning. * * * To the best of my recollection, the storm began about 2 o'clock p. m. on July 21, 1909, and lasted until about 6 o'clock p. m., with an intermission of about one hour between the first and second storms."

P. G. Brooks testified: "My name is P. G. Brooks, age 50 years. On July 21, 1909, I was in Galveston, Tex. I have lived in Wharton county since August, 1887. It is about six miles from Wharton to Glen Flora. I was in Wharton during the September storm 1900, but, as before stated, was in Galveston in July, 1909. I know there was a severe storm in Wharton in September, 1900, and I also know that there was one in Galveston on July 21, 1909, both of which were severe and unusual. As to the strength and severity of the storm of July 21, 1909, at Wharton, I can only judge by the effects, as I was not here (Wharton) at the time. But, judging from the wreckage which I found here and saw on Friday following the storm, I know the damage done by the storm of July 21, 1909, was much greater than that of the storm of September, 1900. I found every church in town practically demolished, and at least half of the business houses damaged to some extent, some few residences blown down, and scarcely a building in the place that was not damaged to some extent."

R. E. Vineyard testified: "My name is R. E. Vineyard, my residence is Wharton, Wharton county, Tex. I was in Wharton, Tex., on July 21, 1909. I have lived in Wharton county for about 25 years. Glen Flora is about six miles distant from the town of Wharton, Texas. I was in Wharton during the storm of September 8, 1900, also in Wharton during the storm of July 21, 1909. They were unusual storms and of greatest severity. I think that the storm of 1909 was more severe, and did more damage to all kinds of property than did the storm of September 8, 1900. All the churches in Wharton were practically demolished by the storm of July 21, 1909, as well as many business houses being partially damaged, and numerous other damages to the residence portion of the city. In my opinion the storm of July, 1900 (1909) was an unusual, exceptional and extraordinary occurrence. * * * The storm of September 8, 1900, was very severe, but not as severe, in my opinion, as that of July 21, 1909."

Tom Brooks testified: "I have lived in Wharton county for nearly 25 years. Glen Flora is about six miles from the town of Wharton, Tex. I was in Wharton on September 8, 1900, and on July 21, 1909, and on both of said dates we had storms of great intensity, and in my opinion the storm of July 21, 1909, was more destructive than the 1900 storm. The damage to buildings in this town (Wharton) was much more severe in the storm of 1909 than in the storm of 1900. The white Presbyterian church, white Methodist church, the Masonic Hall, May's livery stable, and quite a number of other buildings were entirely demolished, and at least half of the buildings in town suffered

loss to a greater or less extent. The storm of July 21, 1900 (1909), was an unusual, exceptional, and extraordinary occurrence."

W. L. Davidson testified: "My residence is Glen Flora, Wharton county, Tex. I was at Mrs. Battle's residence, which is about two miles from Glen Flora, Tex., during the day and night of July 21, 1909. I have lived in Glen Flora for 10 years. I was in Glen Flora, Tex., during the storm of September 8, 1900. There was a storm of extraordinary and unusual velocity on July 21, 1909, at and about Glen Flora, Tex. The storm of July 21, 1909, was of a more violent nature than the storm of September 8, 1900. The damage done to property in the storm of 1909 was much greater than done to property in the 1900 storm. The schoolhouse was displaced during the storm of July 21, 1909, completely demolished, and considerable part of it was carried quite a distance by the wind, while in the storm of 1900 there was no schoolhouse here. A house not more substantial was only thrown off its blocks, and not torn to pieces, which house was very near the site of the said schoolhouse. In my opinion the wind during the storm of July 21, 1909, was of sufficient strength to blow the roofs off of dwelling houses and stores, said roofs being in good condition. Such buildings were unroofed during the day or night of July 21, 1909. * * * I am able to state that the wind on July 21, 1909, was of sufficient strength to blow roofs off of dwelling houses and stores, said roofs being in good condition, from the fact that the roof of my new drug store was blown off, also a gallery of two business houses belonging to me and several other mercantile houses here in town. I examined my own roof and galleries when they were finished, prior to this storm, and found them in good condition. I only know of the two storms mentioned (1900 and 1909) in and about Glen Flora or Wharton county since I have resided here."

A. Brugger, the fireman on the locomotive of the train in question, testified: "There were really two storms on July 21, 1909. When we got to Bonus—that is about 10 miles this side of Glen Flora—I think it was about 1 o'clock in the afternoon. Northwest, I think, it struck us there; and we have got to go down a piece of track there we call the loop to Garwood, about 10 miles down there, and that far back, and we were going down there, and the wind got harder all the time until we got back to Bonus, when it was blowing so bad several cars on the side track started to move, and the brakeman managed to stop them, and we had to go inside. We couldn't go any further. And everything flew around—houses and windmills. I suppose we stayed there until 3 o'clock and the wind slacked up, and we started out again and done pretty well until we got about a mile of Glen Flora, and it looked to me like the wind came back the

other way from the opposite direction, and that is the time we had the fun right. We got to Glen Flora, and we pulled onto the main line. We couldn't see nothing, couldn't go any further; and that lasted until (the hardest part) between 6:30 and 7 o'clock. We got to Glen Flora about 5:30. I don't remember of any damage being done to the train at Bonus. There may have been. I know there was damage to the roof of the depot there. I saw that blow off, part of it; but I didn't notice any roof of the box car blown off. During the storm I was on the engine firing. I had a full view. All I had to do was to stick my head out and look. I have been firing on the railroad since October 23, 1903, about eight years. I do not remember of being in any storm as violent as this one, except the storm of 1900 at Bellville; and in my opinion it was not near as bad, didn't tear things up as this one of 1909 did. There are no facilities at Bonus for repairing cars, and none at Glen Flora. While I was at Glen Flora during this storm I saw roofs of several cars blown off, but whether this car of flour here or not, I never paid any attention to it at all; in fact, it was none of my business. I saw them while going across the country. I was not anxious to see much more anyway. I was trying to keep myself in the clear as much as possible. I saw houses blown down and telegraph wires and posts blown down, and trees rooted up and blowed to pieces."

W. N. Wilson, the conductor on said train, testified: "I am employed at present by the G., C. & S. F. Ry. Co. as freight conductor. On or about July 21, 1909, I was in the employ of G., C. & S. F. in the same capacity. My run was from Bellville to Matagorda. Glen Flora is between those two points. Glen Flora is five miles from Wharton—no, six. As conductors we checked up the cars and keep a record of them. I remember a car of flour and bran consigned to Hood & Martin at Glen Flora in train to arrive at Glen Flora about 5:30 July 21, 1909. That car and the others, too, were unroofed. This car was a shipment to Glen Flora, and next morning I reported it to the agent when I gave him the bills, and told him the roof was off of this car, and, when we went to work next morning, this man's warehouse was, if I am not mistaken, blown down. In fact, I know it was, and we placed the car at the back end of his store so he could unload the flour into the store if he wanted to. It was about the only place you could leave the car. We couldn't take care of it ourselves, the depot was unroofed, and in fact all the other cars in the train were in bad shape, merchandise damaged and everything, and I left my train, the balance of it, except the perishables, at Glen Flora, and except the live stock. * * * I have been railroading about 14 years. I never have been in a storm that was as severe and violent as this storm of July 21, 1909. * * * The

storm lasted until about 8 o'clock. Of course, the wind blew, and it rained, you might say, all night. The wind was most violent between 5:30 and 8 o'clock. It was what you would call a storm or hurricane. I have never been in one like it. That is the only storm I have ever been in. This storm blew up the Cane Belt track from Bay City to Eagle Lake, and damaged all along the track. Where cars were by themselves, it blew them over the rails and turned them over; and it blew the rice mills down. The Cane Belt is the branch from Sealy to Matagorda, and is termed 'Cane Belt.' It is G. C. property. I saw several houses near Bonus blown off the blocks, and the depot at Mathers was blown down, and the depot at Lane City had the top story blown off of it. It is a brick building, and newly built. It was damaged so that after it was repaired they could only make one story out of it. We usually went straight on to Matagorda. That was our terminal. My time at Matagorda, if I remember right, was 5:40 in the afternoon or something like that. The storm was the direct cause of our delay at Glen Flora on this occasion. Of course, the track was obstructed with trees and lumber from these light buildings that had blown down, and planks across the track and such as that, and the water tanks were down, and you can't run an engine without water. There were no regular freight trains operated on that line within the next day or two after the storm."

The car in which the flour was shipped was of standard make, comparatively new, and one of the best in use on the defendant railway. It was carefully examined on the day the flour was loaded and shipped therein, and found to be in good condition. One of the inspectors who made this examination testified: "The car was in good condition all round, nothing wrong with it whatever anywhere at all, roofs, sides, and underframe part of it. I inspected this car after it was loaded." All of the testimony before set out is undisputed, and we think it conclusively shows that the injury to appellee's flour was caused by an unusual and unexpected disturbance of nature which could not have been guarded against by any foresight or care reasonably to be expected of appellant, and was not contributed to by any negligence on the part of the appellant.

[2] Such occurrences are regarded in law as "acts of God," and a common carrier is exempt from liability for loss or damage to goods in its custody occasioned thereby. Railway Co. v. Compton, 38 S. W. 220; Railway Co. v. Crier, 45 Tex. Civ. App. 434, 100 S. W. 1177; Fentiman v. Railway Co., 44 Tex. Civ. App. 455, 98 S. W. 939; 1 Cyc. 758. It is unnecessary to cite authorities to sustain the proposition that a carrier is not liable for damages caused by an act of God when such damage is not contributed to by any negligence on the part of the carrier. The rule is elementary.

[3] There is some difficulty in framing a concise, comprehensive, and accurate definition of the term "act of God" as that term is used and understood when applied to occurrences causing damage for which the carrier is not liable, and it is sometimes difficult to determine from the facts of the particular case whether the occurrence causing the damage complained of should be considered an act of God. We think it settled, however, that when the injury is due directly and exclusively to natural causes, without human intervention, and no amount of foresight or care which could have been reasonably required of the defendant could have prevented the injury, it should be regarded as an act of God for which the defendant is not liable. We think the facts of this case fully meet this test. The occurrences which have been held in some of the cases to be acts of God are spoken of as unprecedented, but it is manifest that an occurrence need not be unprecedented in the literal sense of that word in order to be regarded as an act of God. Any definition of the term which includes the idea that it must be an occurrence the like of which had never happened before would so restrict the application of the rule as to practically abrogate it. Under such definition, a tidal wave, an earthquake, a volcanic eruption, or a storm, it matters not how violent and destructive such disturbance might be, would not be an act of God, unless it was more violent than any of like kind that had preceded it. It goes without saying that this is not the rule. All that is required in this regard to make an occurrence of this kind an act of God is to show that it was so unusual that it could not have been reasonably expected or provided against. There was testimony in this case to the effect that stronger cars than the one in which this shipment was made were manufactured and in use by railways.

[4] It may be conceded as a fact beyond dispute that appellant could have procured cars of sufficient strength to have withstood the storm in question, but it was not required to go to the expense of equipping its road with cars of this kind for the purpose of guarding against a storm which it could not reasonably anticipate as likely to occur. In the Crier Case, supra, the late Justice Neill, with that force and clearness of expression which, combined with his great learning, make his opinions among the most valuable in our appellate reports, says: "A reasonable man can be guided only by a reasonable estimate of probabilities. If men went about to guard themselves against every risk to themselves or others which might by ingenious conjecture be conceived as possible, human affairs could not be carried on at all. The reasonable man, then, to whose ideal behavior we are to look as a standard of duty, will neither neglect what he can foresee as probable, nor waste his time and anxiety on events that are barely possible.

He will order his precaution by the measure of what appears likely in the known course of things." We think the trial court erred in refusing to instruct the jury to find a verdict for the defendant, and appellant's assignment of error complaining of the refusal to give such charge should be sustained.

This conclusion renders it unnecessary to discuss or consider the other assignments of error presented by appellant, or the cross-assignments presented by appellee, which complain of the refusal of the court to give special charges requested by appellee. We think it clear from the undisputed evidence that the injury and damage to appellee was caused by an act of God, and that appellant, not having contributed thereto by any negligence on its part, cannot be held liable therefor. It follows that the judgment of the court below should be reversed and judgment here rendered for appellant, and it has been so ordered.

Reversed and rendered.