NO. 07-01-0476-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

AUGUST 5, 2003

_____

KENDALL MCWILLIAMS, administrator of the estate of
LAWANDA MCWILLIAMS, and as next friend of KEITH MCWILLIAMS,
a minor, and SETH ANDREW MCWILLIAMS, a minor, and TOM NEIL
FERGUSON and VIRGINIA LEE FERGUSON,

Appellants

v.

ROBERT JOHN MASTERSON, WERNER ENTERPRISES, INC.,
DRIVERS MANAGEMENT, INC., PAUL GABEL and KENT GABEL

Appellees

_____

FROM THE 84TH DISTRICT COURT OF HUTCHINSON COUNTY;

NO. 33,389; HON. WILLIAM D. SMITH, PRESIDING

_____

**OPINION**

_____

Before QUINN and REAVIS, JJ., and BOYD, S.J.[1]

Kendall McWilliams (McWilliams), administrator of the estate of LaWanda

McWilliams, Deceased, and as next friend of Keith McWilliams, a minor, and Seth Andrew

_____

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. §75.002(a)(1) (Vernon Supp. 2003).

McWilliams, a minor, and Tom Neil Ferguson and Virginia Lee Ferguson have appealed from a judgment denying them recovery against Robert John Masterson, Werner Enterprises, Inc., Drivers Management, Inc., Paul Gabel and Kent Gabel[2] (collectively referred to as Masterson). Through a single issue, McWilliams and the other appellants contend that the trial court erred by instructing the jury on the theories of unavoidable accident and act of God. As to the former, its submission is no longer permissible under any circumstance, according to the McWilliams. They continued by also arguing that no evidence in this specific case justified the submission. As to the act of God instruction, the trial court allegedly erred because there was no evidence to support its submission. We overrule the issue and affirm the judgment.

### *Background*

On April 25, 1997, around 9:00 p.m., McWilliams was returning home in his Jeep from attending a basketball game in Hereford, Texas. The area through which he drove was experiencing a winter storm. Some testified that the snow had stopped and the sky was only misting at the time. Other evidence indicates that the snow may have still been falling in moderate to heavy amounts. Similarly, one witness testified that the roads were wet but clear. Others testified that they were slick and had to be traversed slowly and carefully. Nonetheless, the speed at which McWilliams traveled was 65 mph, a speed within the posted limit, and with him in the Jeep were his wife, son and son's friend.

---

[2]Paul Gabel and Kent Gabel were dismissed from this appeal in result of an unopposed motion filed by appellants with this court on September 27, 2002.

2

Several miles from the City of Canyon, McWilliams encountered an eighteen wheeler driven by Masterson. The latter was proceeding down the four-lane highway at 50 mph in the outside or right-hand lane. McWilliams decided to pass. In doing so, he moved into the inside or left-hand lane and drove around the left side of the eighteen wheeler. Once the Jeep passed the truck tractor and while attempting to return to the right-hand lane, McWilliams saw cattle in his path and struck one of the animals. Within seconds, Masterson's truck collided with the rear of McWilliams vehicle. As a result of the event, McWilliams' wife died. The other occupants of the car suffered injuries.

McWilliams sued, alleging causes of action in negligence. Trial was to a jury, and before it retired to deliberate, the trial court instructed it on, among other things, the doctrines of sudden emergency, unavoidable accident and act of God. Thereafter, the jurors returned a verdict in favor of the defendants.

### Standard of Review

Whether the trial court erred in submitting a particular instruction to the jury depends upon whether it abused its discretion. *Humphrey v. American Motorists Ins. Co.*, 102 S.W.3d 811, 815 (Tex. App.--Eastland 2003, pet. filed). Furthermore, discretion is abused when the court acts arbitrarily, unreasonably or without reference to guiding principles of law. *Id.* Next, one such legal principle allows the trial court to submit an instruction if there is any support in the evidence for it. *Louisiana-Pacific Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1998); TEX. R. CIV. P. 277 & 278. Finally, in assessing whether any such evidence exists, we construe the record in a light most

3

favorable to submitting the instruction. *Kuykendall v. Doose*, 260 S.W.2d 435, 436 (Tex. Civ. App.--Amarillo 1953, writ ref'd n.r.e.). With this said, we turn to the dispute before us.

*Unavoidable Accident*

As previously mentioned, McWilliams and the other appellants initially question the trial court's decision to instruct the jury on the theory of unavoidable accident. Their attack is twofold. First, they allege that the theory is no longer viable given the Supreme Court's opinion in *Reinhart v. Young*, 906 S.W.2d 471 (Tex. 1995). Then, they aver that the evidence did not warrant its submission. We disagree with both propositions.

First, it is true that various members of the Texas Supreme Court criticized the doctrine in *Reinhart*. Indeed, it has been the subject of comment for quite some time. *See Hill v. Winn Dixie Texas, Inc.*, 849 S.W.2d 802, 803 n.1 (Tex. 1992) (noting some of the criticisms). Yet, a majority of the Court has not reached any consensus on whether its submission should be discontinued. Nor has a majority held the instruction improper in cases involving injury arising from adverse environmental conditions, despite the reservations expressed. *Tanner v. Karnavas*, 86 S.W.3d 737, 740-41 (Tex. App.--Dallas 2002, pet denied). So, until a majority of the Texas Supreme Court expressly directs otherwise, we hold that the doctrine of unavoidable accident remains a viable theory of law upon which a jury may be instructed, especially when the record contains evidence indicating that the loss occurred as a result of adverse weather conditions as described in *Hill v. Winn Dixie*.

Next, the concept of unavoidable accident recognizes the truism that some events or injuries may not be proximately caused by the negligence of anyone. That is, they may

4

result from fate. *Hicks v. Brown*, 128 S.W.2d 884, 890 (Tex. Civ. App.--Amarillo 1939) *modified on other grounds*, 151 S.W.2d 790 (Tex. Comm'n App. 1941, op. adopted) (stating that "the principal element involved in the term 'unavoidable accident' is fate, that is, the event is the result of the intervention of fatalistic elements and is one for which fate alone is responsible"). And, via an instruction on unavoidable accident, the jury is so informed. *See Williams v. Viswanathan*, 64 S.W.3d 624, 629 (Tex. App.--Amarillo 2001, no pet.) (stating that "[t]he purpose of an unavoidable accident instruction is to inform the jury that, although conduct may have been negligent, it must produce the outcome of which the party complains"); *Ordenez v. M.W. Curdy & Co.*, 984 S.W.2d 264, 271 (Tex. App.--Houston [1st Dist.] 1998, no pet.) (stating that "[t]he only purpose of the instruction is to ensure that jurors will understand that they do not necessarily have to find that one or the other party to the suit was to blame for the occurrence"). Consequently, its submission is proper when there is evidence that the event was proximately caused by a nonhuman condition as opposed to the negligence of any party to the event. *Hill v. Winn Dixie Texas, Inc.*, 849 S.W.2d at 803; *Tanner v. Karnavas*, 86 S.W.3d at 740-41. Those nonhuman conditions include acts of mother nature (*e.g.* snow, ice, sleet, fog, and the like) which cause hazardous conditions or obstruct one's view or when someone incapable of negligence due to age causes the harm. *Id.*; *but see*, *Williams v. Viswanathan*, *supra* (a medical malpractice case wherein the condition of the child's lungs, as opposed to the negligence of the treating physician, allegedly caused the child's death). When there is no evidence that the occurrence was caused by such a condition, instructing the jury on the matter is generally improper. *Hill v. Winn Dixie Texas, Inc.*, 849 S.W.2d at 803.

5

Conversely, when there is evidence of that ilk, then the trial court may properly submit the instruction. So, our task at hand is to review the record in a light most favorable to the trial court's decision at bar and with an eye towards "ascertaining whether or not there is presented a theory under which the accident could have happened, notwithstanding [that] all the parties to the transaction . . . exercised the degree of care required by law." *Kuykendall v. Doose*, 260 S.W.2d at 436.

Some evidence at bar illustrates that the cattle which McWilliams encountered were originally within a fenced pasture abutting the highway. Several witnesses testified that the fencing and gates were built in a manner capable of retaining cattle and were in good repair prior to the time the bovine escaped. They apparently escaped by trampling upon a gate. Furthermore, it is undisputed that a winter storm front had moved into the area prior to the accident. With it came near freezing temperatures, blowing wind, rain, snow, mist, and possibly ice. And, it was through these conditions that McWilliams and Masterson drove their respective vehicles.

Other evidence illustrates that the same wintry conditions induced the Gabels' cattle to move about in an attempt to escape the chill. This is instinctive on their part, according to a witness. Their "instinct becomes very strong to move and move away and move with the storm . . . [t]hey will move until they come into an object and they'll keep pushing and pressing until they go through that object or over it or fall down and die, one or the other," he continued. Another witness stated that cattle do not always look for the weakest point in a fence when they attempt to escape. "They can get out anywhere they want to," he

6

opined. "If a cow wants to get out they're going to get out." This was "[e]specially [so] in a snowstorm, if you have got big numbers pushing on anything, they will get out the strongest point or they can get out the weakest point, just where ever they wad up." When asked if it was reasonable for a cattle owner to place someone by the fence during the storm to monitor the activity of the cattle, a third witness opined that it was not. After cattle have been checked several times during storm conditions and it was found that the fences and gates were up and the cattle had "grazing" and water, a "reasonable cattleman" would not know "that the cattle might break wire on a gate or get out of the pasture." Nor would a "reasonable cattleman" be expected to stay with the cattle based upon the chance that the cattle might escape, he continued. This same witness also stated that "[i]t's hard to keep cattle in a storm" and "[w]henever they go to pushing up in a corner, I don't care what kind of fence you got . . . if that wind keeps blowing and you've got enough number in there, they're going to push through about anything."[3] After the cattle left their confines, some entered onto the adjacent highway. It was one or more of those that McWilliams hit.[4]

Next, evidence appears of record illustrating that upon hitting the cattle, McWilliams' vehicle ventured into the right-hand lane in which Masterson drove. Masterson had begun to apply his brakes when he first saw the cattle. And, upon seeing the McWilliams' vehicle enter his lane, he also attempted to steer his rig to the right. An expert estimated that the

---

[3]Another witness described seeing cattle, at one time, push on a six-wire fence with steel posts until it was about to give way. Rather than allow the cattle to break the fence, the witness opted to cut it in several places as means of providing egress to the bovine.

[4]A witness testified that McWilliams could have hit up to three head of cattle, given the evidence found at the scene and on the vehicle.

range of time that lapsed between McWilliams first hitting the cattle and Masterson striking McWilliams' vehicle was from 3.8 to 7.5 seconds. So too did he opine that if the incident occurred within the 3.8 second range, then Masterson could not have avoided the McWilliams vehicle. If it occurred closer to the 7.5 second range then "probably, yes" he could have avoided the accident. When asked about another expert's conclusion that Masterson could have prevented the collision, the witness also stated that "I don't believe its possible to make conclusions that absolutely that Mr. Masterson could have avoided the collision." Counsel also asked the witness if he had an opinion as to the cause of the accident. The witness answered that he did. He believed the cause of the accident was the cattle on the highway.

That the fences and gates were in good repair and capable of holding cattle, that a winter storm had swallowed the area for some time, that cattle instinctively attempt to escape such storms by moving with the storm, that the highway lay in the path of the storm, that little can hold cattle when they opt to escape, that the conditions at the time of the collision were dark and wintry, that the cattle were on the highway due to the storm and their instinctive reaction to it, that the cattle could well have escaped regardless of any precautions which could have been undertaken by the Gabels, that both McWilliams and Masterson were operating their respective vehicles within applicable traffic regulations, that McWilliams struck a cow while lawfully attempting to pass Masterson, that seconds lapsed before Masterson's eighteen wheeler hit McWilliams' vehicle, and that Masterson may not have been able to avoid the collision depending upon how many seconds lapsed is evidence from which a reasonable jury could deduce that the collision was a trick of fate

8

and not the result of any human being's negligence. It is some evidence of "a theory under which the accident could have happened, notwithstanding [that] all the parties to the transaction . . . exercised the degree of care required by law." *Kuykendall v. Doose*, 260 S.W.2d at 436. And, though there was evidence to the contrary, that does not matter. Again, the standard of review obligates us to view the evidence in a light most favorable to the submission of the issue. So, evidence that may urge against submission of the issue is irrelevant.

In sum, the trial court's decision to submit the issue enjoyed support in the evidence. Thus, it did not abuse its discretion when it did so.

*Act of God*

Next, McWilliams and the other appellants questioned the propriety of instructing the jury about an act of God. They believed that the trial court erred because 1) the instruction was duplicative of that on unavoidable accident and, thus, amounted to a comment on the weight of the evidence, and 2) there was no evidence that the incident was caused directly and exclusively by the violence of nature without human intervention or cause, "which [was] an evidentiary predicate for the submission . . . ." We disagree.

We address the last contention first. It has long been the rule that one is not responsible for injury or loss caused by an act of God. *Gulf, C. & S. F. Ry Co. v. Texas Star Flour Mills*, 143 S.W. 1179, 1182 (Tex. Civ. App.–Galveston 1912, no writ). Furthermore, an event may be considered an act of God when it is occasioned exclusively by the violence of nature. *Travelers Ins. Co. v. Williams*, 378 S.W.2d 110, 113 (Tex. Civ.

9

App.–Amarillo 1964, writ ref'd n.r.e.); *Gulf, C. & S. F. Ry Co. v. Texas Star Flour Mills*, 143 S.W. at 1182. And, for one to be insulated from liability, it must be shown that 1) the loss was due directly and exclusively to an act of nature and without human intervention, and 2) no amount of foresight or care which could have been reasonably required of the defendant could have prevented the injury. *Id.* Furthermore, the act of nature must be unusual or unprecedented. Yet, it need not be the sole, greatest, or harshest violent act ever experienced. *Gulf, C. & S. F. Ry Co. v. Texas Star Flour Mills*, 143 S.W. at 1182. Instead, it need only be so unusual that it could not have been reasonably expected or provided against. *Id.*

Turning to the record before us we again encounter that evidence which supported the trial court's decision to instruct the jury on unavoidable accident, *e.g.* the time of night, the presence of a winter storm, the cattle's instinctive reaction to the storm, their penchant to escape irrespective of the quality of the fence and gate in which they were confined, the lawful operation by McWilliams and Masterson of their respective vehicles at the time, the inability of Masterson to avoid the accident depending upon the number of seconds that transpired, and the like. To it we add the evidence that the winter storm occurred on the 25th day of April, 1997. Furthermore, a local meteorologist testified that as much as 12 inches of snow may have fallen in the area and that it may have been snowing at a moderate to heavy rate at the time of the accident. So too did he state that the time of year at which the storm occurred was shocking or surprising to weathermen, though through the years five other storms had been as late or later. Apparently, at least one weatherman was surprised "that . . . this particular storm happened so late and was as strong as it was."

10

Moreover, by the time this storm entered the area, the cattle had slicked off or shed their natural winter hair. This is of import because had they had their winter coat, they could have better fared the storm. The foregoing constitutes some evidence of a violent act of nature directly and exclusively, without human intervention, causing loss and which act one could not reasonably foresee or prevent its effects. Thus, we conclude that the court's decision to submit the instruction about an act of God was supported by the evidence.

Nevertheless, McWilliams argues that human agency or intervention was indeed involved. The human agency contemplated was that represented by Masterson driving the truck and ultimately striking McWilliams with it. True, a vehicle operated by a human struck McWilliams. Yet, what is meant by allusion to the absence of human intervention is not the absence of all human involvement but the absence of human negligence proximately causing the injury. That this is true is exemplified by the opinion in *Luther Transfer & Storage, Inc. v. Walton*, 296 S.W.2d 750 (Tex. 1956). There, the Texas Supreme Court declared that "for a defendant to be relieved of liability for an unprecedented flood, there must be no negligence of the defendant concurring with the act of God to cause the damage resulting." *Id.* at 753; *accord*, *Macedonia Baptist Church v. Gibson*, 833 S.W.2d 557, 560 (Tex. App.–Texarkana 1992, writ denied) (holding that the injuries were not caused by an act of God since the lightning was channeled through an improperly installed lightning protection system). So, that a human may have been involved does not matter as long as his negligence, if any, did not also cause the injury. And, as previously discussed, evidence appears of record which reasonably permitted the factfinder to conclude (assuming it chose to believe it) that neither the Gabels nor

11

Masterson were negligent or, if negligent, their negligence was not a concurring or proximate cause of the loss.

So too does McWilliams question the propriety of the instruction because the weather purportedly was not a direct cause of Masterson colliding with McWilliams. He believes that the effect of the weather "ended when the cattle went through the gate." At that point, their own instincts took over. Yet, McWilliams cites us to no authority explaining what constitutes a direct cause. Nor does he argue that it is something other than the cause implicit in the idea of proximate cause. Moreover, we see no reason to conclude that the nexus involved in each should be different. So, we will treat them as the same.

Next, to satisfy the causal element of proximate cause, it need only be a substantial factor in bringing about the harm. *Southwest Key Prog., Inc. v. Gil-Perez*, 81 S.W.3d 269, 274 (Tex. 2002). Furthermore, to be a substantial factor, it is not necessary that the act giving rise to the injury be the one nearest the injury. *Atchison v. Texas & P Ry.*, 186 S.W.2d 228, 231 (Tex. 1945). Nor must it be the only act involved. Rather, it can be one of several events in a natural and continuous sequence of events which produces a particular result and without which the result would not have occurred. *See Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991) (stating that conduct is a cause if in a natural and continuous sequence it produces an event and without it the event would not have occurred). Stated differently, if it "set in motion a natural and unbroken chain of

12

events that led directly and proximately . . ." to a particular result, then the conduct or act legally caused the result. *Hart v. VanZandt*, 399 S.W.2d 791, 793 (Tex. 1965).

Here, evidence appeared of record that the unusual winter storm not only triggered the instinctive nature of the cattle but also combined with that instinct to herd the cattle in the direction of the highway. According to at least one witness, cattle instinctively move with a storm. For instance, if a storm blows from the north to the south, the cattle will head south with the storm. Thus, a storm can be compared to a herdsman leading the cattle along in its path. And, at bar, the storm was proceeding in a direction towards (and consequently driving the cattle towards) the highway on which McWilliams and Masterson drove, or at least some evidence of record so indicates.

Next, no one could reasonably deny that if a herdsman drove cattle onto a roadway and a car hit one of the herd, then the herdsman's conduct was a substantial factor in bringing about the collision. We see no reason to reach a different conclusion when an act of God substitutes itself as the herdsman. In both situations the cattle move per the direction of the herdsman. And, if those directions lead one or more of the herd onto a roadway, then a factfinder may reasonably deduce that the directions of the herdsman constituted a substantial factor in bringing about the presence of the cattle onto the roadway. In sum, there existed some evidence of a direct causal link, which evidence was sufficient to warrant the instruction given by the trial court.

Finally, McWilliams posits that the jury should not have been instructed about an act of God since the instruction, when coupled with that involving unavoidable accident,

13

constituted a comment on the weight of the evidence and nudged the jurors towards a particular result.[5] Furthermore, he cites our opinion in *Williams v. Viswanathan* as support for the proposition. We disagree. Though an argument akin to that at bar was asserted in *Viswanathan*, nowhere in that opinion did we accept the proposition. Instead, we held that because evidence supported the submission of each instruction and the appellant provided us with no authority supporting the suggestion "that the submission of both issues had a cumulative erroneous effect," the trial court did not err by instructing the jury on both theories. *Williams v. Viswanathan*, 64 S.W.3d at 630-31. That is the situation here. Submission of each instruction was supported by the evidence, and McWilliams cited us to no authority holding that submission of both instructions constituted an unwarranted comment on the evidence. So, our ruling in *Viswanathan* is no less applicable here.

In conclusion, the trial court did not err by instructing the jury about unavoidable accident and act of God. We overrule McWilliams' sole issue and affirm the judgment of the trial court.

Brian Quinn
Justice

---

[5]The comment, according to McWilliams, was the suggestion that the jury should relieve the defendants of liability because the availability of all these theories indicated that the defendants did not cause the injury.

14